WAGNER, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–727–CR. Argued January 6, 1977.—*
*Decided February 15, 1977.*
(Also reported in 250 N. W. 2d 331.)

For the plaintiff in error there were briefs by *Mark A. Frankel* and *Frankel, Langhammer & Pines,* and oral argument by *Mark A. Frankel,* all of Madison.

For the defendant in error the cause was argued by *Nadim Sahar,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

CONNOR T. HANSEN, J. It appears that an automobile driven by the defendant and a vehicle operated by an unknown driver were involved in a drag race down Central avenue, the main street in Marshfield, Wisconsin, on July 24, 1974, at about 11 o'clock p.m. It is alleged the vehicle operated by the defendant struck and fatally injured one George C. Fitz. This prosecution followed.

On July 24, 1974, the defendant, a resident of St. Paul, Minnesota, with his wife and two children, traveled to Marshfield, Wisconsin, to visit his parents. He had recently undergone a hernia operation, had been off work for approximately 11 weeks, and was under medication. The medication consisted of pain pills and sleeping pills. The defendant testified that he took two of the pain pills during the day and possibly one of the sleeping pills

during the evening of July 24, 1974. Upon arrival at his parents' home, the defendant had supper, consumed two or three cans of beer, and at approximately 8:30 p.m., went out with two of his younger brothers, Steve Wagner and Mike Wagner, to play pool.

The trio left in the defendant's 340 cu. in. Dart Swinger, with the defendant driving. They visited a total of four bars, drinking beer and possibly some hard liquor and playing pool in each. The defendant drove between the first three bars and they walked to the fourth. At approximately 11 p.m. they decided to leave the last bar and drive back to the defendant's parents' home.

There was no direct testimony that defendant was driving. The defendant testified that he remembered nothing after drinking at the first bar. He attributed his lack of memory or "black out" to a combination of the pain pills and the beer. Steve testified that he had blacked out and could not remember who was driving. Mike testified that he could not remember who drove, but he knew it was not him. Mike testified that he was sitting in the back seat of the car. He recalled the defendant and Steve getting in the front seat from the passenger's side, although he did not remember which one got in first.

Although Steve originally told the Marshfield police that he had been driving, he subsequently retracted that statement—first, in a signed statement wherein he stated that the defendant was driving, and second, at trial where he stated that because of the blackout he did not know who was driving. In typed statements given to Marshfield police officers shortly after the incident and signed by both Steve and Mike, they indicated that the defendant was driving. The typed statements were introduced into evidence.

The defendant's car headed south from the last bar on Central avenue and stopped at a red light. The defendant's car was in the right lane of the four lane highway.

Another car pulled up to the left of the defendant's and comments were exchanged between the occupants of the two vehicles. The engines of both vehicles were revved up and when the light changed, the vehicles proceeded to drag race southward on Central avenue. Two eyewitnesses, Brent Wayne Varner and David Steven Felton, observed the drag race. The second car has never been located.

At approximately the same time as the drag race was in progress, George C. Fitz was leaving the Downtowner Bar which was located to the south on Central avenue. He was apparently in the process of crossing Central avenue to his parked car when the racing vehicles bore down on him. Fitz's exact position in the street was unclear from the record.

Mike testified that during the drag race and before the defendant's car crossed the railroad tracks, he felt an impact and the windshield shattered. He was facing backward at the time and saw nothing. Steve testified that he did not remember the car coming in contact with anything. In the signed typed statements, both Mike and Steve indicated that they recalled hitting an object, Steve believing it was a parked car.

The two eyewitnesses testified that while the drag race was in progress, and in the vicinity of the Downtowner, they observed the two vehicles suddenly swerve to the left approximately one-half of a traffic lane. Varner testified that he heard a thud when the vehicles swerved and saw a light colored object thrown up from the car in the right lane. Felton heard the thud but did not see the object. Varner then testified, "Well, both of us ran down to where, right in front of the Downtowner; and I saw a man lying there." The man was later identified to be the fatally injured George C. Fitz.

The vehicles did not stop, but continued south over the railroad tracks and out of sight. Richard John Cooper, who lived approximately two–three blocks from Central avenue, testified that at the time and date in question

he heard the squealing of tires and loud roar of mufflers on Central avenue; observed what was later identified as the defendant's car cross the railroad tracks causing sparks to fly; and observed the car go by his house at approximately fifty miles per hour. The latter observation concerning speed was objected to by the defense. Cooper was eventually instrumental in leading the police to the defendant's car.

Mike testified that after the impact they continued on toward his parents' home. The car hit a cement post in an alley and stopped. Mike and Steve pushed it out and eventually pushed it into their parents' yard. Both Mike and Steve testified that the defendant was driving at that time. The trio entered the house.

Ivo M. Wagner, the defendant's father testified that the boys came in after 11 p.m. The defendant walked straight through the kitchen into the dining room and flopped down on the couch apparently unconscious. Mike and Steve came in and Mike said that they had just sideswiped a car. Mike left, and Mr. Wagner began to discuss the matter with Steve. Mike bicycled back to Central avenue to find out what they had hit. He returned with the information that a man had been hit and killed on Central avenue. While Mike, Steve and Mr. Wagner were discussing what to do, the police arrived.

Marshfield police officers, Kenneth Wortman, Kenneth A. Fuller and Donald R. Haralson testified for the State. Wortman and Fuller testified that they were called to investigate the accident and found George C. Fitz fatally injured, lying in the gutter on the south-bound side of Central avenue. Cooper approached Fuller and indicated that he thought he knew where one of the cars that was involved was located.

Fuller departed with Cooper and went to the 400 block of Cedar street where he found the defendant's car parked on the lawn at 408 Cedar. He examined the

car, finding that the right hood was bent in; there was blood along the hood and door post; the right front windshield reinforcing post was bent and bloody; and the antenna was broken off. Fuller did not state that the windshield was broken, but that fact was later established. Fuller called Wortman for assistance; the car was impounded; and Mike, Steve and the defendant were taken into custody. Mike and defendant were taken into custody first. Because the defendant was unconscious, he was transported by ambulance to the hospital. Steve was taken into custody shortly thereafter by Wortman after attempting to evade arrest.

Delores Pearl Larson, deputy coroner for Wood county, testified as to the extensive fatal injuries incurred by Fitz, and as to her opinion that the cause of death was a "cerebral hemorrhage due to a skull fracture." Larson testified that a blood sample for the purposes of alcohol content analysis had been taken from the deceased. Out of the presence of the jury, the defense, in an offer of proof, established that the deceased's blood alcohol content was .145 percent. The defense's attempt to introduce that information into evidence was subsequently denied by the trial court.

Medical technologists, Steven Hilgart and Foster Soper, and Doctor Ronald Laessig, all testified as to an analysis of the alcohol content of the defendant's blood, establishing it at approximately .178 percent at about two hours after the incident. Dr. Laessig estimated that at the time of the incident, the defendant's blood alcohol content was approximately .21 percent.

The State called a total of seventeen witnesses and rested its case. The defense proceeded with its case, calling as witnesses only the defendant and his wife. A number of motions were made by the defense at the close of the State's case and at the end of the trial. Each was denied. Over the objections of the defense, a con-

temporaneous tape recording of the charge to the jury was made and was taken into the jury room to be used by the jury during its deliberations.

## ISSUES.

In view of our disposition of this case, it is only necessary that we direct our attention to two of the several issues presented by the defendant. They are as follows:

1. Based upon the evidence presented, could the jury find the defendant guilty, beyond a reasonable doubt, of second-degree murder?

2. Was it reversible error for the trial court to allow tape-recorded jury instructions to go into the jury room?

## SUFFICIENCY OF THE EVIDENCE.

In a criminal prosecution, the burden is on the State to prove every essential element of the crime charged beyond a reasonable doubt. On appeal, when the defendant challenges the sufficiency of the evidence, the test for this court's review is whether the evidence adduced, believed and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. That test has most recently been set forth in *Taylor v. State*, 74 Wis.2d 255, 246 N.W.2d 518 (1976).[1]

Sec. 940.02, Stats., defines second-degree murder:

"*940.02 Second-degree murder.* Whoever causes the death of another human being by conduct imminently

---

[1] *See also: Wangerin v. State*, 73 Wis.2d 427, 433, 243 N.W.2d 448 (1976); *State ex rel. Kanieski v. Gagnon*, 54 Wis.2d 108, 113, 194 N.W.2d 808 (1972); *Bautista v. State*, 53 Wis.2d 218, 223, 191 N.W.2d 725 (1971); *State v. Davidson*, 44 Wis.2d 177, 199–200, 170 N.W.2d 755 (1969); and *Strait v. State*, 41 Wis.2d 552, 559, 164 N.W.2d 505 (1969).

dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

In order to support the conviction of the defendant, the State must have proved beyond a reasonable doubt the following essential elements: (1) That the defendant's conduct was imminently dangerous to another; (2) that his conduct was of such a character that it evinced a depraved mind, regardless of human life; and (3) that there was a relation of cause and effect between the death of George C. Fitz and the defendant's conduct imminently dangerous to another and evincing a depraved mind, regardless of human life. *Seidler v. State,* 64 Wis. 2d 456, 219 N.W.2d 320 (1974).

The evidence elicited, in particular the testimony of witnesses Fuller, Larson and Varner, supports the conclusion that Fitz's death resulted from his being struck by the defendant's vehicle. Further evidence, in the form of the signed statements of Steve and Mike Wagner, and in their trial testimony, supports the reasonable inference that the defendant was the driver of his vehicle at the time that it struck Fitz. On the basis of the above evidence, the jury, acting reasonably could conclude beyond a reasonable doubt that the defendant's conduct was the cause of Fitz's death.

Regardless of the cause of death, the defendant contends that the evidence was insufficient to show beyond a reasonable doubt that the conduct of the defendant was imminently dangerous to another or was conduct evincing a depraved mind regardless of human life.

The conduct of the defendant which the state established at trial was that of drag racing a vehicle down a main street of Marshfield, Wisconsin, at approximately 11 p.m. while intoxicated. The defendant does not appear to take issue with the State's assertion that he was engaged in some form of drag racing when the victim was struck. Nor does the defendant contest the fact that he

was intoxicated. The defendant concedes that his conduct may have been negligent or even reckless, but argues that such reckless, negligent or heedless operation of a motor vehicle does not reach the degree of culpability which the law prescribes for murder in the second-degree. A review of the evidence elicited and an analysis of the applicable law supports the contention of the defendant.

## CONDUCT IMMINENTLY DANGEROUS TO ANOTHER.

*Seidler v. State, supra,* 461, sets forth a portion of Wis JI—Criminal, Part II, 1110, which considers conduct "imminently dangerous" in the following language:

" 'The first element of second degree murder requires that the defendant's conduct was imminently dangerous to another, that is, conduct dangerous in and of itself. It must have been conduct inherently and consciously dangerous to life and not such as might casually produce death by misadventure.' "

The defendant argues that the manner in which he operated his vehicle was not "inherently and consciously dangerous to life." The State relies upon this court's decision in *Montgomery v. State,* 178 Wis. 461, 190 N.W. 105 (1922), to argue the opposite. In *Montgomery, supra,* the defendant therein was convicted of the second-degree murder of three pedestrians whom he struck with his vehicle while they were standing in the street about to board a streetcar. There was substantial evidence that the defendant therein was intoxicated at the time. This court stated at p. 466:

". . . It would seem to require no argument to show that the act committed by the defendant, to wit, the driving of a large car at high speed down a much-traveled track, by a standing street car, without any regard for the presence of persons who were standing in the

street about to board the car, was the commission of an act imminently dangerous to others. . . ."

In the instant case, the evidence produced at trial, which could reasonably be believed by the jury and relied upon by it in reaching its verdict, is evidence that defendant was racing down a city street during the hours of darkness while intoxicated. While there was no direct testimony as to specific speed at the time of the impact, there was sufficient evidence for the jury to reasonably conclude that the defendant, while engaged in the competition of drag racing was traveling at speeds faster than would ordinarily be prudent under the circumstances.

Steve Wagner's written statement indicated that they were ". . . speeding down Central Avenue side by side [with the other car] . . ."; that they were going ". . . pretty fast. . ."; and that they were ". . . racing down the street. . . ." Mike Wagner's written statement indicated that the occupants of the other car offered to engage in a drag race; that engines were revved up and that shortly after the commencement of the race ". . . Chuck [the defendant] really started to pull away. . ." Eyewitness Varner testified that he heard engines rev up; observed the defendant's vehicle and the other vehicle accelerating side by side down Central avenue; and that they speeded up going past him. Eyewitness Felton testified that he heard engines rev up and that he watched the ". . . drag racing. . ." down the street. Witness Cooper testified that he heard the loud roar of the mufflers and the squealing of tires on Central avenue; that he observed the defendant's car wheel around the corner near his home, accelerate to a good rate of speed and cross over a set of railroad tracks causing sparks to fly. Cooper testified that in the vicinity of his home, approximately two and one-half blocks from the incident, he estimated the vehicles speed to be approximately fifty miles per hour. In addition, the jury

was presented with evidence concerning the extensive fatal injuries suffered by Fitz; the location of Fitz's body; and the extent of the damage done to the right front side of the defendant's vehicle.

Although the written statements of the Wagners and the testimony of the eyewitnesses as to speed immediately before and at the time of impact were not specific, all were in good positions to observe firsthand the movement of the defendant's vehicle at the critical time. Under these circumstances the statements and testimony were competent evidence supporting a finding that while engaged in a drag race, the defendant was traveling at a high degree of speed, although the specific speed was not established. *Shaw v. Wuttke,* 28 Wis.2d 448, 457, 137 N.W.2d 649 (1965); *Merkle v. Behl,* 269 Wis. 432, 435, 436, 69 N.W.2d 459 (1955); *Gerbing v. McDonald,* 201 Wis. 214, 220, 229 N.W. 860 (1930).

It cannot be argued that drag racing on a public street in the middle of town is not a dangerous activity. The question is, however, whether the defendant's conduct in engaging in such a drag race under these circumstances was so dangerous as to constitute the type of conduct defined in the second-degree murder statute?

In the second-degree murder case of *Hogan v. State,* 36 Wis. 226 (1874), this court stated at pages 246, 247:

"The first condition of the statute is, that the act producing death shall be imminently dangerous to others. It has been said that every act producing death must be thus dangerous. Perhaps this is literally true. But the statute does not go on fortuitous or latent danger, but on essential and apparent danger, of the act producing death. The act must be inherently and consciously dangerous to life, not such as casually produces death by misadventure. It must be dangerous in and of itself, as committed and when committed, whether death follow it or not. . . ."

This court stated further at page 249:

"In our view of murder in the second degree, it goes in any case upon constructive intent to kill, intent imputed by law where there is no actual intent to kill. . . ."

*See also: Seidler, supra,* 462; *State v. Dolan,* 44 Wis.2d 68, 73, 170 N.W.2d 822 (1969), discussing *Hogan, supra,* in connection with sec. 941.30, Stats. (Endangering safety by conduct regardless of life.)

In *Seidler, supra,* 463, 464, this court set forth a number of cases involving sec. 940.02, Stats., and cases arising under other statutes using the phrase "imminently dangerous" as illustrative of the type of conduct covered by the statutory definition as follows:

". . . *Kasieta v. State* (1974), 62 Wis.2d 564, 215 N.W.2d 412, conviction of second-degree murder in beating defendant's ex-wife with fists while knowing she suffered from Hodgkin's disease; *State v. Van Ark* (1974), 62 Wis.2d 155, 215 N.W.2d 41, conviction under sec. 941.30, for placing homemade bomb in the neck of a car's gas tank; *State v. Weso* (1973), 60 Wis.2d 404, 210 N.W.2d 442, conviction under sec. 941.30, for striking at victim and cutting his face with knife; *Austin v. State* (1971), 52 Wis.2d 716, 190 N.W.2d 887, second-degree murder conviction for shooting the victim with gun; *State v. Dolan* (1969), 44 Wis.2d 68, 170 N.W.2d 822, conviction under sec. 941.30, for threatening a person while holding a knife to his throat; *State v. Kanzelberger* (1965), 28 Wis.2d 652, 137 N.W.2d 419, certiorari denied (1966), 385 U.S. 867, 87 Sup. Ct. 127, 17 L.Ed.2d 93, second-degree murder conviction for striking victim on head with Indian club; *State v. Johnson* (1940), 233 Wis. 668, 290 N.W. 159, second-degree murder for firing shots into porch and toward street where children were playing; *Montgomery v. State* (1922), 178 Wis. 461, 190 N.W. 105, second-degree murder for killing three pedestrians when he switched into a lane where persons were standing preparatory to boarding a streetcar; *Radej v. State* (1913), 152 Wis. 503, 140 N.W. 21, second-degree murder conviction for putting gun at victim's head and discharging it."

*Seidler, supra,* and *State v. Dolan, supra,* indicate generally the type of conduct which this court has found

to be characteristic of the constructive-intent-to-kill criteria set forth in *Hogan, supra.* Although each case must rest upon its own facts and the circumstances surrounding the conduct of the defendant, there is a common fact present in many of the cases cited in *Seidler* and *Dolan;* that is that the conduct of the defendant was directed toward a specific victim or group of victims, the existence of whom the defendant was or should have been aware.

The defendant argues that conviction under sec. 940.02, Stats., must be predicated in part upon a finding that the defendant's conduct was directed specifically toward a particular person or group of persons. Sec. 940.02, Stats., does state that the conduct must be ". . . imminently dangerous to *another* . . ." (Emphasis added.) In *Hogan, supra,* the second-degree murder statute there in question stated that the conduct must be ". . . imminently dangerous to *others* . . ." (Emphasis added.) (R.S. 1858, C. 164, sec. 2) Therein this court stated, at page 247:

". . . We are not only at liberty, we are bound, [in construing a penal statute] to hold the phrase in the singular, as well as in the plural, if necessary to the true construction and application of the statute. R.S. ch. 5, sec. 1. This was the rule of construction with which the statute was adopted. And we take the true effect of the words to be, that the act shall be dangerous to other or others, that is to say, than the person committing it. . . ."

Whatever inferences can be drawn from the legislative change of "others" to "another" in the second-degree murder statute, it is clear that there is no statutory requirement (and there has been imposed no judicial requirement) that the conduct be directed toward anyone or any group in particular. The statute speaks in terms of engagement in the conduct and not the direction of that conduct. It is the character of the conduct, and the

result that it in fact be imminently dangerous to one other than the accused which controls, and not the actual or constructive direction of that conduct toward another.

In the majority of the cases set forth in *Seidler, supra,* the conduct was directed specifically toward a victim. The existence of that factor may be a consideration in establishing the culpability of a defendant in a second-degree murder case, but it is not controlling. Where the conduct is directed toward a specific victim the jury will have a broader base upon which to infer a constructive intent to kill and the absence of the casual production of death by misadventure.

The State relies heavily upon *Montgomery, supra,* to support its contention that the defendant's conduct here was imminently dangerous to another. Although the defendant advances several distinguishing points between *Montgomery, supra,* and the instant case, one is particularly significant.

In *Montgomery, supra,* the defendant turned into the lane of travel where the victims were standing. He did so despite the fact that other occupants of his vehicle saw the victims and warned him that he would thereby kill people in the street. Although the defendant had been warned of the existence of the victims in the street, presumably in time to avoid them, he continued on in their direction, ultimately striking them down. While the defendant testified that he did not see the victims until it was too late, the jury could readily infer from the testimony of the other occupants that he knew or should have known of their presence, but yet took no measures to avoid hitting them.

In the instant case, neither the defendant, nor the occupants of his vehicle, saw the victim in the road prior to striking him. In fact, the evidence is unclear as to whether the victim was standing in the road while the vehicle bore down on him, or whether the victim suddenly stepped in front of the vehicle. In any event, there

was no testimony that the defendant was forewarned of the victim's presence in the street. Moreover, upon first seeing the victim, the defendant swerved to the left in an attempt to avoid striking him. The evasive action by the defendant demonstrates some concern for the life and safety of others, which was totally lacking in *Montgomery, supra.*

The *Hogan, supra,* constructive intent element was readily inferable in *Montgomery, supra,* where the accused drove at a high rate of speed down a busy street without regard for the presence of persons who were standing in the street, directly in his path. The gravamen of the offense in *Montgomery, supra,* was that the accused drove into a group of people, plainly visible to him—a group which the jury could infer that he was aware of. It was not only the driving of a large car at high speeds down a busy street, but that fact coupled with the accused's conscious disregard for the safety of the victims which enabled the jury in *Montgomery, supra,* to reasonably find that the conduct there was "imminently dangerous."

It is the latter element which is missing in this case. While consciously driving a vehicle into a group of people under the *Montgomery, supra,* circumstances may imply or indicate a constructive intent to kill, drag racing down a city street under the circumstances of this case does not. The conduct may well be reckless or negligent and it may carry with it a high probability of death or injury, but it is not conduct imminently dangerous to another or such conduct that carries with it the implied intent to kill as those criteria are interpreted in the second-degree murder statute.

Under certain circumstances, racing down a city street or any public highway could well result in a second-degree murder conviction if death was caused. The qualities of conduct which render it imminently dangerous and evincing a depraved mind regardless of life are to be

found in the conduct itself *and* in the circumstances of its commission. *Hogan, supra,* 236; *State v. Weso,* 60 Wis.2d 404, 409, 210 N.W.2d 442 (1973). For an instance where imminently dangerous conduct involving motor vehicles has been established, *see Bednarski v. State,* 53 Wis.2d 791, 193 N.W.2d 668 (1972).

We believe that under the facts of this case, the proof was insufficient in respect to the element of conduct imminently dangerous to another.

## CONDUCT EVINCING A DEPRAVED MIND, REGARDLESS OF HUMAN LIFE.

Both *State v. Dolan, supra,* 73, 74, and *Seidler, supra,* 465, 466, refer, with approval, to the definition of conduct "evincing a depraved mind" set forth in Wis JI—Criminal, Part II, 1110, which states:

". . . The depravity of mind referred to in second degree murder exists when the conduct causing death demonstrates an utter lack of concern for the life and safety of another and for which conduct there is no justification or excuse. . ."

The meaning of that phrase was also discussed by this court in *State v. Weso, supra.* Although that case dealt with a conviction under sec. 941.30, Stats., Endangering safety by conduct regardless of life, this court held that the term "depraved mind" was not used differently in sec. 940.02. *State v. Weso, supra,* 408. This court stated at pages 410, 411, 412:

"A depraved mind is one having in inherent deficiency of moral sense and rectitude. Otherwise it would not prompt an act which in its nature is imminently dangerous to the safety of another. The element of the disregard for life likewise calls for a state of mind which has no regard for the moral or social duties of a human being.

"A depraved mind must be indifferent to the life of others. Such negative attitude is not found in the mind of a normal, reasonable person. The desire to live and the recognition others desire to live and have a right to life is innate in the mind of a normal person. Mere negligence alone is not sufficient. A high degree of negligence may be an element. Such degree of negligence is an element of homicide by negligent use of a vehicle or weapon in sec. 940.08, Stats., and is defined in sub. (2) as follows:

" '(2) A high degree of negligence is conduct which demonstrates ordinary negligence to a high degree, consisting of an act which the person should realize creates a situation of unreasonable risk and high probability of death or great bodily harm to another.'

Likewise, recklessness alone is not sufficient. Such conduct if it endangers another's safety in the handling of a weapon such as a firearm or knife is a crime under sec. 941.20, Stats., and if death results, it constitutes homicide by reckless conduct under sec. 940.06. Reckless conduct is defined in secs. 940.06(2) and 941.20 (3) as:

" '(2) Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin.'

"To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another . . . A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment. A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm. . . ."

While the defendant created a situation of unreasonable risk and high probability of death or great bodily harm which demonstrated a conscious disregard for the

safety of another, his conduct did not demonstrate a state of mind ". . . devoid of regard for the life of another. . ." *State v. Weso, supra,* 411. At the very least, his attempt to avoid striking the victim by swerving to the left indicates some regard for the life of the victim. That fact alone distinguishes the instant case from *Montgomery, supra,* in regard to its finding of conduct evincing a depraved mind regardless of life.

The defendant makes a further argument, the disposition of which is not essential to the disposition of this case but which, nevertheless, is addressed.

The defendant cites *State v. Dolan, supra,* 72, for the proposition that in order to constitute conduct evincing a depraved mind, the conduct must be such as is performed with a ". . . general intention to do harm without concern whether such harm would result in death. . ." *See also: State v. Stuart,* 50 Wis.2d 66, 72, 183 N.W.2d 155 (1971), for overly broad reference to "intent to harm." This court's holding in *State v. Weso, supra,* 411, 412, makes it clear that the only intent necessary for the purposes of establishing the element of "depraved mind" is the intent to do the act and not the intent to cause any harm. This court in *State v. Dolan, supra,* was construing the elements necessary for a conviction under sec. 941.30, Stats. The "intent to harm" language in *State v. Dolan, supra,* was used in the context of a discussion of the entire crime there involved and not specifically in the context of the interpretation of the single element of "depraved mind." While the term "depraved mind" might not be used differently in ss. 941.30 and 940.02, Stats., one cannot necessarily equate general statements made about all of the elements in sec. 941.30 with the specific element of "depraved mind" in sec. 940.02.

The defendant, also directs our attention to *Wangerin v. State, supra,* in support of his contention that there must be a general intent to do harm implicit in either

the concept of imminently dangerous conduct or conduct which evinces a depraved mind. The defendant therein was convicted of second-degree murder of the victim, whose death resulted from a severe beating. The defendant therein relied upon *Seidler, supra,* to contend that his conduct was not imminently dangerous. In distinguishing *Seidler, supra,* this court in *Wangerin, supra,* stated at pp. 434, 435:

"The real distinction between the case at bar and *Seidler* was the total lack of evidence there of acts undertaken with any intention of harming the deceased. The evidence indicated a purpose of throwing the victim on the bed."

The above quoted statement from *Wangerin, supra,* is perhaps overlybroad. It was not the lack of evidence of any intent to harm the deceased in *Seidler, supra,* which this court found critical, but rather the lack of intent to do the act which resulted in the death, *i.e.,* a lack of evidence that Seidler consciously threw the victim at the hard and unyielding portions of the bed. *Seidler, supra,* 463.

Intent to kill is not a element of second-degree murder. *Jones (George Michael) v. State,* 70 Wis.2d 41, 49, 233 N.W.2d 430 (1975); *Christian v. State,* 54 Wis.2d 447, 455, 195 N.W.2d 470 (1972); *State v. Carter,* 44 Wis.2d 151, 155, 170 N.W.2d 681 (1969). Nor is intent to do harm an element of second-degree murder. *State v. Weso, supra,* 412. The statute does not require the existence of any particular state of mind in the actor at the time of the crime but only requires that there be conduct imminently dangerous to human life, which conduct evinces a depraved mind. *Jones, supra,* 49; *Ameen v. State,* 51 Wis.2d 175, 185, 186 N.W.2d 206 (1971). We are of the opinion the proof is also insufficient in regard to establishing the element of conduct

evincing a depraved mind regardless of human life beyond a reasonable doubt.

## TAPED JURY INSTRUCTIONS.

At the close of the trial, in open court, the trial court tape recorded its oral instructions to the jury. The jury was allowed to take the tape recording with them into the jury room for use during deliberations. The defense counsel objected to such use of the tape recorded instructions by the jury. The defendant here contends that the use of the taped instructions, in effect, introduces the court into the jury room and results in the jury being reinstructed by the court in the absence of counsel. Such procedure, argues the defendant, is inherently prejudicial because the tapes are ". . . replete with suggestive voice inflections and other verbal intimations."; because the jury may listen to particular instructions or portions thereof in isolation; and because the presence of a tape recorder in the jury room permits an unsupervised and unreviewable use of an electronic device by the jury.

Because of our disposition of this case, we do not decide whether sending taped jury instructions into the jury room for unrestricted use by the jury during their deliberations constitutes reversible error.[2] We are of the opinion, however, that it is a practice not to be encouraged. We believe the better practice is to call the jury back into the courtroom if a replay of the taped instructions, or a portion thereof, is requested. One reason is that this will provide a record of what specific use was made of the tape recordings.

This case was tried before a jury for three days. We have reviewed the record and conclude that the unfortu-

[2] In *Franklin v. State*, 74 Wis.2d 717, 247 N.W.2d 721 (1976) it was held to be reversible error to send a taped confession of the defendant to the jury room.

nate event which brought about this prosecution differs in substance from the statutorily defined crime of second-degree murder. We are obliged to reverse the judgment of conviction and order denying a new trial on a lesser included offense.

*By the Court.*—Judgment and order reversed and cause remanded, with directions to grant the defendant's motion for a new trial.