**Richard Paul PEARS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6783.**

Court of Appeals of Alaska.

Nov. 25, 1983.

---

Dick L. Madson, Cowper & Madson, Fairbanks, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

While driving while intoxicated, Richard Pears caused an automobile accident in which two people died and one was injured. The state charged Pears with two counts of murder in the second degree, and one count of assault in the second degree. A jury convicted Pears on all three counts, and Judge Jay Hodges sentenced Pears to twenty years for the murder convictions and five years for the assault. The sentences are concurrent. Judge Hodges also revoked Pears' driver's license permanently. Pears has appealed his conviction and sentence to this court. We affirm Pears' conviction and sentence.

Pears first argues that Judge Hodges should have dismissed the grand jury indictment for second degree murder. The second degree murder statute under which Pears was charged, AS 11.41.110(a)(2), provides:

A person commits the crime of murder in the second degree if

(2) he intentionally performs an act that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life.

Pears argues that the legislature did not intend to have a motor vehicle homicide prosecuted as murder and that his offense should only have been charged as manslaughter. Manslaughter is defined in AS 11.41.120(a) and provides:

A person commits the crime of manslaughter if he

(1) intentionally, knowingly, or recklessly causes the death of another person under circumstances not amounting to murder in the first or second degree.

We find unpersuasive Pears' argument that the legislature did not intend for any motor vehicle homicide which was caused by an intoxicated driver to be charged as murder. This court discussed the relationship between second-degree murder and manslaughter in *Neitzel v. State*, 655 P.2d 325, 335–38 (Alaska App.1982). In that case we indicated that the difference between second-degree murder and manslaughter was one of degree which was a question for the jury under proper instructions:

Under the Revised Code, negligent homicide and reckless manslaughter are satisfied by conduct creating a significant risk of death absent justification or excuse. They differ only in the actor's knowledge of the risk. In differentiating reckless murder from reckless manslaughter, the jury is asked to determine whether the recklessness manifests an extreme indifference to human life.

.  .  .  .  .

[T]he jury must consider the nature and gravity of the risk, including the harm to be foreseen and the likelihood that it will occur. For both murder and manslaughter, the harm to be foreseen is a death. Therefore, the significant distinction is in the likelihood that a death will result from the defendant's act. Where the defendant's act has limited social utility, a very slight though significant and avoidable risk of death may make him guilty of manslaughter if his act causes death.

Driving an automobile has some social utility although substantially reduced when the driver is intoxicated. The odds that a legally intoxicated person driving home after the bars close will hit and kill or seriously injure someone may be as low as one chance in a thousand and still qualify for manslaughter. Where murder is charged, however, an act must create a much greater risk that death or serious physical injury will result.

*Id.* at 337.

██ The legislature has not indicated that no motor vehicle homicide could be charged as second degree murder. It is certainly clear that an automobile can be as dangerous a weapon as a gun or a knife and the results of its misuse just as deadly. It seems clear to us from the Revised Criminal Code that where a driver's recklessness manifests an extreme indifference to human life he can be charged with murder even though the instrument by which he causes death is an automobile. We conclude Judge Hodges did not err in refusing to dismiss the indictment charging Pears with murder in the second degree.[1]

Pears next argues that Judge Hodges erred in not dismissing the indictment because the district attorney did not read the manslaughter statute to the grand jury when a grand juror asked the district attorney to "read the material for manslaughter." The prosecutor responded:

Manslaughter is a lesser degree, a lesser included offense of second degree murder. It basically involves recklessly causing the death of another person, under circumstances not amounting to murder in the first degree or second degree. In essence, what we're talking about is the degrees of conduct. Some types of motor vehicle homicides would warrant reckless, or simply the finding of reckless. Some types of vehicular motor homicides would require a lesser standard of simply negligence, and then there's some which we allege in this case, and this is what

1. We emphasize that a charge of second-degree murder should only rarely be appropriate in a motor vehicle homicide. The murder charge in this case is supported by the extreme facts which are set out more fully later in the opinion.

you are to determine, that warrant even a higher standard of extreme indifference to the value of human life, and that's what the jury has to decide.

■ First, the prosecutor's response does inform the grand jury about the offense of manslaughter. Second, as Pears admits in his brief, the prosecution is not generally required to offer lesser-included charges to the grand jury where the evidence is sufficient for the grand jury to indict on the charge presented to them. *Oxereok v. State,* 611 P.2d 913, 916–18 (Alaska 1980). We find that the trial court was correct in concluding that the indictment should not be dismissed because the prosecutor failed to more fully inform the grand jury about the lesser-included crime of manslaughter.

■ Pears next argues that the trial judge erred in admitting the results of his breathalyzer test. Pears argues that the Alaska implied consent statute, AS 28.35.-031, applies only to the offense of driving while intoxicated. Pears also points out that the implied consent form which he signed only informed him that he was under arrest for driving while intoxicated and that he was not told until after the breathalyzer test that he could be charged with a more serious homicide offense. Pears argues that he did not give any meaningful consent to take the breathalyzer test because he was not aware that the result of the test could be used against him in a homicide prosecution. He therefore claims the breathalyzer test was illegally seized evidence and the results of that test should have been suppressed.

Former AS 28.35.031 reads as follows: *Implied consent.* A person who operates or drives a motor vehicle in this state shall be considered to have given consent to a chemical test or tests of his breath for the purpose of determining the alcoholic content of his blood or breath *if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating or driving a motor vehicle while intoxicated.* The test or tests shall be administered at the direction of a law enforcement officer who has reasonable grounds to believe that the person was operating or driving a motor vehicle in this state while intoxicated. [emphasis added]

It is clear that AS 28.35.031 does not apply just to the offense of driving while intoxicated but also to any offense which arose out of acts which were committed while a person was driving while intoxicated. *Pena v. State,* 664 P.2d 169, 171–74 (Alaska App. 1983) (implied consent statutes apply to a manslaughter charge which arose out of an incident where the driver killed another while driving while intoxicated.) Since Pears' murder charges arose out of acts which he committed while driving while intoxicated, the implied consent statute applied to him and he was required to take the breathalyzer test.

■ It is clear that a person who is required to take a breathalyzer test under the implied consent statute does not have any statutory or constitutional right to refuse to take the test and does not have to be advised that he does not have to take the breathalyzer examination. *Graham v. State,* 633 P.2d 211, 214 (Alaska 1981); *Palmer v. State,* 604 P.2d 1106, 1110 (Alaska 1979); *Wirz v. State,* 577 P.2d 227, 230 (Alaska 1978). Since Pears was required to take the breathalyzer examination under the implied consent statute, the fact that he was not informed that he could be facing homicide charges or that the results of the breathalyzer could be used as evidence against him in a prosecution for homicide is not a ground for suppressing this evidence.

■ Pears argues that the results of the breathalyzer examination should have been suppressed because the police did not preserve a sample of his breath for later independent testing. Although we held in *Anchorage v. Serrano,* 649 P.2d 256, 260 (Alaska App.1982), that the state was under an obligation to offer to preserve a breath sample or conduct another test which would allow a defendant to independently check breathalyzer test results, that holding applied only to cases which were joined with

*Serrano,* had suppression motions granted in the trial courts, or to cases where the arrest for an offense arising out of driving while intoxicated took place after the *Serrano* decision. Pears' case is in none of those categories and therefore the *Serrano* rule does not apply. *State v. Lamb,* 649 P.2d 971 (Alaska App.1982). In addition we note that the state did conduct a blood test on Pears. Shortly after the breathalyzer test Pears had a blood test performed by hospital personnel which allowed him to check his breathalyzer test result. Pears' breathalyzer test result showed a blood alcohol level of .17 percent. The blood alcohol test given at the hospital showed a blood alcohol of .16 percent. We conclude that the trial judge did not err in refusing to suppress the breathalyzer test result on this ground.

■ Pears also argues that his due process rights were violated because the police did not offer him a chance to perform field sobriety tests on video tape. Pears argues that if he performed the field sobriety tests well on the video tape, this would tend to establish that the breathalyzer result, which indicated that he was intoxicated, was incorrect. *Denison v. Anchorage,* 630 P.2d 1001 (Alaska App.1981). It appears to us that the trial court did not err in refusing to suppress the breathalyzer results on this ground. Pears had just been in a severe collision and the wisdom of having Pears perform sobriety tests is questionable. There does not appear to have been any misconduct on the part of the arresting officers in failing to have Pears perform the tests. There also is no indication that Pears was prejudiced by the fact that no evidence of his ability to perform field sobriety tests was available for trial. There were witnesses to Pears' driving and state of sobriety both before and after the accident. There was the evidence of the blood test at the hospital which confirmed the original breathalyzer result and which was independently admissible. We conclude that the trial court did not err in refusing to suppress the breathalyzer test result on this ground.[2]

Pears contends that Judge Hodges erred in admitting into evidence the results of the blood test which was performed on Pears in the hospital. Pears argues on appeal that he did not meaningfully consent to the blood test because he was remorseful and confused at the time of the test. He also argues that he was not informed that the test could be used against him in a trial for murder or manslaughter. Judge Hodges ruled that Pears voluntarily consented to the test.

■ In determining whether Pears consented to the blood test, the state has the burden of showing consent. Consent must be shown based on the totality of the circumstances. In reviewing the evidence, we view it in the light most favorable to the prevailing party. *Pierce v. State,* 627 P.2d 211, 216 (Alaska App.1981). The record shows that Officer Stepp informed Pears that he wanted to take a blood sample to verify the breathalyzer and to determine if Pears had taken any drugs other than alcohol. Stepp also informed Pears that a death had resulted from the collision.

2. The test for whether it is appropriate for the trial court to impose sanctions for failure to preserve or disclose evidence is set out in *Putnam v. State,* 629 P.2d 35, 43–44 (Alaska 1980): What, if any, sanctions are appropriate is to be determined by weighing the degree of culpability involved on the part of the state, the importance of the evidence which has been lost, and the evidence of guilt which is adduced at trial. Where the evidence in question was destroyed in bad faith or as part of a deliberate attempt to avoid production, sanctions will normally follow. On the other hand, where it appears that the evidence was lost or destroyed in good faith, the imposition of sanctions will depend upon the degree to which the defendant has been prejudiced. In cases where the defendant cannot reasonably be said to have been prejudiced by the state's good faith failure to preserve the evidence, sanctions will generally not be appropriate. Where, however, the defendant has suffered prejudice, sanctions will generally be warranted. Just what sanction is appropriate in a given case is best left to the sound discretion of the trial court. [citations and footnotes omitted.]

See also *Fletcher v. Anchorage,* 650 P.2d 417 (Alaska App.1982).

Pears signed a written consent agreeing to the blood test. The testimony of the various witnesses who were at the hospital when Pears took the blood test tended to establish consent. We conclude that Judge Hodges did not err in finding that Pears consented to the blood test.

■ Pears next contends the trial court erred in denying his motion at trial that the foundation to admit the breathalyzer packet had not been adequately established. Pears' specific argument is that the document which indicated that Michael Pulice was a qualified breathalyzer instructor and breathalyzer calibrator was inadequate. However, in another document in the breathalyzer packet, Michael Pulice certified that he was a qualified breathalyzer instructor and calibrator. In *State v. Huggins,* 659 P.2d 613, 619 (Alaska App.1982), we held that "the breathalyzer instructor can personally certify that he is a qualified instructor," following *Keel v. State,* 609 P.2d 555, 559 n. 12 (Alaska 1980). Although in *Keel* the certification by the breathalyzer instructor was under oath, and in the present case it is not, the document in the · current case is certified as a true and correct copy of a document from the Fairbanks Police Department and was filed as a public record under 7 AAC 30.010. There is no reason for us to doubt that Michael Pulice is a qualified breathalyzer instructor or calibrator as he certifies. There is also no reason to suspect that there was a forgery of an official record. Pears certainly could have taken Pulice's deposition if there was any question about the document or Pulice's qualifications. We emphasize that the defendant's objection went only to whether the foundation for admission of the breathalyzer had been properly established. Nothing precluded Pears from attacking the breathalyzer result by pointing out to the jury any weakness in the foundation or in the administration of the test. We therefore hold that the trial judge did not err in finding that a proper foundation had been established for the breathalyzer.

■ Pears next contends that Judge Hodges erred in not granting his motion for judgment of acquittal for murder in the second degree. "In determining whether to grant a motion for a judgment of acquittal, the trial court must view the evidence and the inferences therefrom in the light most favorable to the state and decide whether reasonable minds could conclude that guilt had been established beyond a reasonable doubt." *Siggelkow v. State,* 648 P.2d 611, 613 (Alaska App.1982). When we look at the evidence in the light most favorable to the state, we conclude that a jury could find that Pears committed second-degree murder. The evidence produced at trial indicated that Pears voluntarily drank in a bar to the point of intoxication. After becoming intoxicated he drove recklessly, speeding, running through stop signs and stop lights and failing to slow for yield signs. His passenger at the time, Kathy Hill, told him that his driving scared her. Pears and Kathy Hill then went to another bar and had more drinks. Pears and Hill then left the bar and while they were approaching his truck on foot, Pears was stopped by two uniformed police officers in a patrol car. One of the officers told Pears not to drive because he was too intoxicated. Pears and Hill walked back toward the bar until the officers were out of sight. They then returned to his truck and drove away. Once again, with Hill protesting, Pears drove over the speed limit and ran red lights and stop signs. Pears then dropped Kathy Hill off and continued to drive around. Shortly before the fatal collision Pears was seen by Steve Call, who was turning his car onto the four-lane Steese Highway. According to Call, Pears' car ran a red light on the highway, going through the light at a high rate of speed and passing two cars which were stopped at the light. Call said he was going about forty-five miles per hour, the speed limit, but Pears was going faster. As they approached the next intersection Call could clearly see the red light against them and the cars stopping. Pears got around the cars which were stopping by passing them in the right turn lane, going into the intersection without breaking or slowing down. Pears collided with one of the cars entering the intersection on the green light,

an orange Datsun. The impact of the collision knocked the Datsun 146 feet, killing two of the three people in the car and seriously injuring the third.

We believe that a jury could have found that Pears' driving constituted circumstances manifesting an extreme indifference to human life. He was made abundantly aware of the dangerous nature of his driving by both his passenger, Kathy Hill, and the police officers who warned him not to drive. The fact that Pears drove recklessly and ran stop signs and red lights several times before the fatal collision supports the theory that he did not inadvertently run the red light when the collision occurred but that he was intentionally running the red light at high speed without regard for the fact that other cars were crossing the intersection.[3] We believe this evidence would support a second degree murder conviction and conclude that Judge Hodges did not err in refusing to grant Pears' motion for judgment of acquittal.

■■ Pears also contends that his sentence of twenty years' imprisonment is excessive. There is little question from the extreme recklessness which resulted in the collision that Pears' offense was particularly serious and that Judge Hodges did not err in imposing a substantial sentence of imprisonment. On the other hand, Pears' sentence appears to be substantially greater than other sentences that courts have imposed in this state for homicides caused by intoxicated drivers. For instance, in *Sandvik v. State,* 564 P.2d 20, 26 (Alaska 1977), the supreme court upheld a sentence of twenty years with eight years suspended

for the offense of negligent homicide. The defendant in that case had six prior convictions for operating a motor vehicle while under the influence of alcohol and had a twenty-year alcohol problem. In *Rosendahl v. State,* 591 P.2d 538, 539–40 (Alaska 1979), the supreme court upheld ten-year concurrent sentences for negligent homicide and failure to render assistance to an injured person. The court noted that the defendant had a "significant driving offense record which includes both alcohol and non-alcohol related offenses." In *Layland v. State,* 549 P.2d 1182, 1184 (Alaska 1976), the supreme court upheld an eight-year sentence. Layland had two convictions for operating a motor vehicle under the influence of alcohol, one of which arose out of an incident that occurred after the motor vehicle homicide. In *Godwin v. State,* 554 P.2d 453, 455 (Alaska 1976), the supreme court upheld a sentence of ten years with five suspended on a manslaughter charge which arose from operating a motor vehicle while under the influence of alcohol. The defendant in that case had prior convictions for several driving offenses including negligent driving and reckless driving. He was also on probation for breaking and entering at the time of the accident. In *Gullard v. State,* 497 P.2d 93, 94 (Alaska 1972), the supreme court upheld a ten-year sentence for manslaughter, although the court disapproved any restriction on parole. Gullard killed four people. Gullard also was convicted twice of operating a motor vehicle under the influence of alcohol after the fatal accident but before sentencing. These appear to be some of the more severe sentences for intoxicated driv-

---

3. Pears claims that he was passed out when he entered the intersection. Under the instructions given by the court the jury apparently rejected this contention and concluded that Pears intended to drive while intoxicated in a manner constituting extreme indifference to human life. The court charged:

Our law provides that voluntary intoxication is generally not a defense to a prosecution for an offense.

However, in the crime of murder in the second degree for which the defendant is charged in Counts I and II, the necessary element is the existence in the mind of the defendant of the intent to drive a motor vehi-

cle while intoxicated in a manner constituting extreme indifference for the value of human life.

If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider the state of intoxication in determining if defendant had such intent.

If from all the evidence you have a reasonable doubt whether the defendant was capable of forming such intent, you must find that he did not have such intent.

"Intoxication" includes intoxication from the use of a drug or alcohol.

ers who committed motor vehicle homicides. There are also many cases where much more lenient sentences have been imposed.[4]

We note that in the former cases where courts have sentenced drivers who were convicted of a motor vehicle homicide to sentences in the range of ten years, a significant factor in justifying that sentence appears to be the existence of convictions for operating a motor vehicle under the influence of alcohol (now driving while intoxicated) or similar offenses. Frequently these offenses occurred after the fatal accident. Although Pears has several driving offenses, he has not been convicted of driving while intoxicated, reckless driving or negligent driving.

Of course, one problem with relying on these former cases in deciding whether Pears' sentence is appropriate is that the former sentences were imposed for either negligent homicide or manslaughter. Pears is the first person in this state to be convict-

ed of murder for a motor vehicle homicide.[5] The jury found that Pears' conduct was extreme; it manifested an extreme indifference to human life. In addition, Pears' conduct resulted in two deaths and severe injury to a third person.

The question of whether the sentence imposed in this case is excessive is a close one. Balanced on one side is Pears' conduct and the result of that conduct. Balanced on the other side is the fact that Pears' sentence appears to be the most severe ever imposed for a vehicular homicide in the State of Alaska. Pears was only nineteen at the time of this offense and had no prior record of alcohol related driving offenses. We conclude that the former Alaska cases which involved sentences for motor vehicle homicide can and should be distinguished because those sentences were imposed for negligent homicide and manslaughter. The instant case involves a charge of murder. If Pears' sentence is looked at as a sentence

---

**4.** In *State v. Lamebull,* 653 P.2d 1060 (Alaska App.1982), the court imposed a five-year suspended sentence with no period of incarceration for a motor vehicle manslaughter conviction which involved an intoxicated driver. We held that the sentence was too lenient. We indicated that a sentence in excess of one year should have been imposed. In *Connors v. State,* 652 P.2d 110 (Alaska App.1982), we held that a sentence of three years with two suspended was not clearly mistaken for a negligent homicide conviction. In *State v. Lupro,* 630 P.2d 18 (Alaska App.1981), the defendant was convicted for negligent homicide and failure to render assistance to a person injured in an accident. Lupro was originally sentenced to five years with four suspended. His sentence was stayed during appeals and he was resentenced, nearly six years after the fatal accident, to two concurrent five-year suspended sentences by the trial judge who noted that Lupro had not been in trouble since the fatal accident and appeared to have rehabilitated himself. We held the sentence was too lenient and held that Lupro should have received a sentence of not less than three years' imprisonment initially and that even after his apparently complete rehabilitation several years later, the nature of his offense was such that the trial judge should have sentenced him to a period of more than one year. *Id.* at 21 n. 8.

**5.** It has been generally recognized that the mere fact that a motor vehicle has been the instrumentality of death does not preclude a

murder charge where the evidence also discloses the requisite elements of murder. *Commander v. State,* 374 So.2d 910 (Ala.Cr.App. 1978); *People v. Watson,* 30 Cal.3d 290, 179 Cal.Rptr. 43, 637 P.2d 279 (1981); *Hamilton v. Commonwealth,* 560 S.W.2d 539 (Ky.1978); *People v. France,* 57 A.D.2d 432, 394 N.Y.S.2d 891 (N.Y.App.Div.1977); *Farr v. State,* 591 S.W.2d 449 (Tenn.Cr.App.1979); *Wagner v. State,* 76 Wis.2d 30, 250 N.W.2d 331 (1977); *See also State v. Boone,* 294 Or. 630, 661 P.2d 917 (1983).

However, other courts have recognized that it is difficult to establish the element of malice, or its equivalent, and to apply the general statutes or doctrines governing murder. In two of the above listed cases it is certainly arguable that the courts would not have allowed a murder charge for Pears' conduct. In *Wagner v. State,* the court decided that the defendant could not be convicted of murder for killing a person while drag racing down the main street of a town at 11:00 p.m. while intoxicated. 250 N.W.2d at 336. In *People v. France,* the defendant killed a person during a high speed automobile chase at 3 a.m. while attempting to escape from the police. The defendant apparently ran through several traffic signals while attempting to elude the police. 394 N.Y.S.2d at 892. In the other cases cited it appears that Pears' conduct would fall within the murder statutes.

*See generally Homicide By Automobile As Murder,* 21 A.L.R.3d 116 (1968).

for murder, we do not believe that we can find that it was clearly mistaken. In *Page v. State*, 657 P.2d 850, 855 (Alaska App. 1983) we said:

A review of the sentences for second-degree murder considered by the supreme court and this court since [1980] indicate that the typical sentence is twenty to twentyfive years. It is possible that the reported cases overstate sentences, since someone receiving less than twenty years may not be strongly motivated to appeal. Twenty years is therefore a proper benchmark to measure sentences for this crime. Any sentence substantially exceeding that amount would appear at least provisionally suspect. It would appear appropriate, therefore, in light of AS 12.55.-125(b) and experience in sentencing second-degree murderers, both before and after enacting the revised code, that one convicted of that offense should receive a sentence of from twenty to thirty years. Naturally, mitigating circumstances could reduce the sentence down to the five-year minimum and aggravating circumstances could enhance it up to the ninety-nine year maximum. [footnote omitted]

Thus Pears' twenty-year sentence does not appear to be out of line with other sentences which have been imposed for murder. We conclude that although Pears' sentence is severe and certainly appears to be significantly greater than any sentence which has formerly been imposed in a case in this state involving a motor vehicle homicide, the sentence is not clearly mistaken.

The conviction and sentence are AFFIRMED.

SINGLETON, Judge, with whom BRYNER, Chief Judge, joins concurring.

Richard Pears argues that as a matter of statutory construction vehicular homicide cannot equal second-degree murder regardless of the facts. AS 11.41.110(a)(2). He separately argues that the evidence presented during his trial was insufficient to support a conviction of second-degree murder and that the court erred in denying his motion for judgment of acquittal. The court rejects both of these arguments. I agree with that result, first, because I am convinced that there are certain limited circumstances under which vehicular homicide can constitute second-degree murder and, second, because I am convinced that this is one of those rare cases. I believe it is important to stress, however, that a *prima facie* case for manslaughter is not automatically a *prima facie* case for second-degree murder. A trial judge faced with a prosecution for vehicular homicide must carefully evaluate the prosecution's case-in-chief in deciding whether to permit a jury to deliberate on the issue of second-degree murder.

An automobile clearly constitutes a "dangerous instrument" as that term is defined in the Revised Code. " 'Dangerous instrument' means anything which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is capable of causing death or serious physical injury." AS 11.81.900(b)(11). Certainly an intoxicated person in control of a dangerous instrument in a place where others are present creates a substantial and unjustifiable risk that death or serious injury will occur, *see* AS 11.81.900(a)(3) (defining recklessly). A person commits the crime of manslaughter if he recklessly causes the death of another person under circumstances not amounting to murder in the first or second degree. AS 11.41.120(a)(1). Consequently, a prosecutor showing that an intoxicated person drove a car and caused a death probably makes a *prima facie* case of manslaughter as defined in AS 11.41.120(a).

Before recklessness can meet the test of second-degree murder, however, it must "manifest an extreme indifference to the value of human life." As we noted in *Neitzel v. State*, 655 P.2d 325, 335–38 (Alaska App.1982), murder, which is defined based upon the Model Penal Code, requires a finding of recklessness virtually amounting to purpose or knowledge:

In a prosecution for murder, however, the Code calls for the further judgment whether the actor's conscious disregard of the risk, under the circumstances, manifests extreme indifference to the value of

human life. The significance of purpose or knowledge as a standard of culpability is that, cases of provocation or other mitigation apart, purposeful or knowing homicide demonstrates precisely such indifference to the value of human life. Whether recklessness is so extreme that it demonstrates similar indifference is not a question, it is submitted, that can be further clarified. It must be left directly to the trier of fact under instructions which make it clear that recklessness that can fairly be assimilated to purpose or knowledge should be treated as murder and that less extreme recklessness should be punished as manslaughter.

655 P.2d at 335–36, *quoting* A.L.I., *Model Penal Code and Commentaries,* Part II, § 210.2, at 21–23 (1980) (footnote omitted).

In determining whether recklessness approaches purpose or knowledge we must bear in mind the common law distinction drawn between intent and motive. Intent is the immediate object of the defendant's act while his motives are the underlying reasons for his act, the benefits he hopes to obtain or detriments he hopes to avoid. The common law has always included within the results intended by a defendant those results which will necessarily follow from his act even if he has no motive to achieve them. For example, if a man insures his wife knowing that she will take an airplane trip and then plants a bomb in her suitcase intending to explode the airplane and cause her death, he is held to have intended the death of the other passengers on the airplane even though he was "indifferent" to their welfare because their deaths were necessary side effects of his intended action, the destruction of the airplane in flight. *See* W. LaFave & A. Scott, *Criminal Law* § 28, at 196 (1972), where the authors state:

> With crimes which require that the defendant intentionally cause a specific result, what is meant by an "intention" to cause that result? Although the theorists have not always been in agreement as to the answer to this question, it is now generally accepted that a person who acts (or omits to act) intends a result of his act (or omission) under two quite different circumstances: (1) when he consciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when he knows that the result is practically certain to follow from his conduct, whatever his desire may be as to that result. [footnotes omitted]

Sometimes the common law called the first mental state "specific intent" and the second "general intent." *See Bidwell v. State,* 656 P.2d 592 (Alaska App.1983). Under the Revised Code the two meanings of intent are separated into "intent" and "knowledge." LaFave & Scott, at 197–98.

In summary, reckless murder occupies the middle ground between (1) mere recklessness, creating a substantial risk of death, and (2) knowledge, creating a virtual certainty of death. Before Pears could be found guilty of murder, his recklessness must be found to approach knowledge that his acts were practically certain to cause death or serious physical injury.

Three factors, in my opinion, distinguish this case from the typical drunk driver homicide. First, Pears drove despite the fact that his companion, Kathy Hill, warned him that his driving was endangering her and other people. Second, Pears was stopped by two uniformed police officers and told not to drive and by his conduct led the police officers to believe that he would not drive. Finally, the evidence supports a finding that Pears just missed colliding with a number of other vehicles on the road prior to the eventual homicide. Given these factors, I think a *prima facie* case of murder was made. It was therefore a jury question as to whether Pears' conduct manifested extreme indifference to the value of human life.