JONES (George Michael), Plaintiff in error, v. STATE, Defendant in error.

*No. State 215 (1974). Argued September 9, 1975.—Decided September 30, 1975.*
(Also reported in 233 N. W. 2d 430.)

---

[35] ABA *Standards Relating to The Prosecution Function and The Defense Function,* p. 25, sec. 1.1 (c) (approved draft, 1971).

42

44

For the plaintiff in error there was a brief by *Braden & Olson* of Lake Geneva, and oral argument by *John O. Olson*.

For the defendant in error the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

BEILFUSS, J. The defendant asserts as error the trial court's refusal to give a requested jury instruction on a lesser-included offense of homicide by intoxicated user of a firearm; the admission in evidence and sending to the jury the bloodstained nightgown of the victim; and the refusal to allow the defendant to testify as to the period of time he had been sexually intimate with the victim.

He has requested a new trial in the interest of justice because of claimed prosecutorial misconduct and the reading of only a portion of a witness' testimony upon request of the jury during its deliberation.

The defendant also contends the evidence is insufficient to support the verdict of first-degree murder.

The evidence adduced at trial indicates that the defendant first met the victim, Miss Diana Teadt, in June of 1973, at a Beloit tavern, Alias Smith and Jones. She had just completed high school. Thereafter, the two saw each other frequently and discussed marriage, but had decided that it was not possible until the defendant had solved a personal financial problem. The defendant testified that Miss Teadt had told him she was pregnant and he presumed he was the father. On the weekend preceding the shooting the defendant had accompanied Miss Teadt to her family's cottage in northern Wisconsin. They returned to Beloit on Monday, August 6th, where the defendant dropped Miss Teadt off at her place of employment following a short stop at her home to allow her to change clothes.

The defendant picked Miss Teadt up from work later the same day and the couple went to Alias Smith and Jones, arriving at about 9:30 p.m. Between the time of arrival and approximately 11:30 p.m., the couple talked with friends, drank and played games. The defendant testified that he consumed 10 glasses of beer and four shots of peppermint schnapps during that time.

A friend of Miss Teadt, who was also present at the tavern, testified that at one point in the evening while the defendant was gone to the restroom, Diana suggested that a pool party be held in her backyard sometime later that week. The defendant was not to be told of the party, the friend stated, because a former boyfriend of Diana's was in town and the defendant's presence at the party was expected to "cause a few problems."

Later in the evening he found out about the party and was told by Diana that she wished to go with her former boyfriend. Shortly thereafter, at approximately 11:30 p.m., the couple left the tavern to go back to Diana's home. On the way the couple argued about the

proposed party. The defendant stated he was upset because of Diana's desire to go to the party with another man when she was presumably pregnant with his child. The argument continued inside the house and he angrily punched a hole through a bedroom door with his fist. Miss Teadt slammed the door and he punched through it twice more. He left the house alone and returned to the tavern at about midnight.

Before leaving the tavern again at approximately 1:30 a.m., the defendant stated he consumed four more glasses of beer, three shots of peppermint schnapps and two glasses of wine. Just prior to leaving, he telephoned a friend, Edward Edge. Edge testified that the defendant asked to come to see and talk with him and stated he was afraid he might do something he would be sorry for. Instead, the defendant returned to the Teadt house where he found Diana asleep on her back on the floor in the front room with the lights on and the stereo going "full blast."

The defendant testified that he turned the stereo off and attempted to awaken Miss Teadt but got no response. He then went behind her to lift her up, stating that he intended to put her into bed. As he bent over to pick her up his gun went off. He could not remember how the gun went off and did not state why he had it with him at that time.

The defendant then drove to the home of Edward Edge, arriving at approximately 2 a.m. Edge testified that defendant told him he had just shot and killed his girl friend. He told Edge he had tried to arouse Miss Teadt, had lifted her, the gun was pointed in the direction of her back and it went off. He also stated to Edge that "maybe I should go back and pump a couple more into her." Edge suggested he turn himself into the police. The defendant gave the gun, a .38-caliber revolver, to Edge and drove to the police station at Beloit.

In front of the police station he went up to Officer Perry Edge, a brother of his friend Edward Edge. He told Officer Edge that he had killed his girl friend. Officer Edge informed the defendant of his *Miranda* rights. He said he knew she was dead because he had seen dead "gooks" in Viet Nam and made a "comment" about how he had grasped his girl friend around the neck and shot her through the neck. The officer could not recall the exact conversation.

The defendant was then taken to Janesville and, after a *Miranda* warning, questioned by Detective Captain Gerald Dilley. Dilley asked the defendant if he would like to discuss the shooting of Diana Teadt. The defendant responded, "There's nothing to talk about. I went there to kill her and I killed her. That's all there is to it." And further, "I have killed men before and I don't kill somebody unless I want to kill them."

At the trial the defendant testified that he was intoxicated and did not remember making these statements to the officers.

There was also evidence given by an expert witness as to the residue of chemicals on the hands of the defendant. Although the expert found greater amounts of the chemical in the palm of the defendant's hand than on the back of his hand, which he would not normally expect, he stated the amounts found were not sufficient to perform a conclusive test and that he could not form an opinion as to whether or not the defendant fired the revolver.

The information charged first-degree murder. The jury was instructed on first- and second-degree murder and on intoxication as a defense if the condition of the defendant negatives the existence of a state of mind essential to the crime. The court refused defense counsel's requested instruction on homicide by intoxicated user of firearm, sec. 940.09, Stats.

The law is clear in Wisconsin that to justify submitting lesser charges of homicide than that charged in the information there must be a reasonable ground in the evidence for acquittal on the greater charge and for conviction on the lesser charge. *Ross v. State* (1973), 61 Wis. 2d 160, 211 N. W. 2d 827; *Harris v. State* (1975), 68 Wis. 2d 436, 228 N. W. 2d 645; *State v. Anderson* (1971), 51 Wis. 2d 557, 187 N. W. 2d 335; *Zebrowski v. State* (1971), 50 Wis. 2d 715, 185 N. W. 2d 545; *State v. Bergenthal* (1970), 47 Wis. 2d 668, 178 N. W. 2d 16, certiorari denied (1971), 402 U. S. 972, 91 Sup. Ct. 1657, 29 L. Ed. 2d 136.

The defendant contends that there is a reasonable ground in the evidence to support acquittal on the charge of first-degree murder and conviction of homicide by intoxicated user of a firearm under sec. 940.09, Stats. Under the rule set forth in *Wilson v. State* (1973), 59 Wis. 2d 269, 208 N. W. 2d 134, and recently affirmed in *Harris v. State, supra,* however, the defendant must also show that the evidence demonstrates a reasonable ground for acquittal on the charge of second-degree murder. If no reasonable ground exists for acquittal on either of the greater charges of first- or second-degree murder, it is of no avail that the evidence would reasonably support conviction on the lesser charge of homicide by intoxicated user of a firearm. *Harris, supra.*

In considering whether there is a reasonable ground in the evidence to support acquittal on the greater charge and conviction on the lesser, the evidence is to be viewed in the most favorable light it will reasonably admit from the standpoint of the accused. *Ross v. State, supra.* The defendant contends that the evidence, when so viewed, demonstrates a reasonable ground for acquittal on the charge of first-degree murder because there was a reasonable doubt as to whether defendant intended to kill Diana Teadt as required for conviction under sec. 940.01 (1), Stats.

The record in this case indicates that the trial court agreed with defendant on this point. In considering proposed instructions, the court stated:

"Well, gentlemen, I'm prepared to rule upon the request that the court submit as a lesser-included offense the offense of second-degree murder. As counsel are well cognizant of the fact that the credibility of the witnesses and the weight to be given to the testimony, of course, is a matter for the jury. The trial judge is required to submit a lesser-included offense if there's reasonable basis in the evidence that would permit a conviction of a lesser-included offense and acquittal of the greater offense. Should the jury believe the testimony as to the defendant's state of intoxication, of course, they might well find it sufficient to negative the intent that is a necessary element of first-degree murder and should they do that, then second-degree murder would, in the judgment of the court, be involved and would be a necessary lesser-included offense to be submitted to the jury. I'll therefore over the objection of the state submit second-degree murder as a lesser-included offense. . . ."

The further question in this case is whether there is a reasonable ground in the evidence to support acquittal on the charge of second-degree murder. Intent is not an element of second-degree murder. *Christian v. State* (1972), 54 Wis. 2d 447, 195 N. W. 2d 470; *State v. Carter* (1969), 44 Wis. 2d 151, 170 N. W. 2d 681. To constitute second-degree murder under sec. 940.02, Stats., the conduct producing death must be imminently dangerous to others and must evince a depraved mind regardless of human life. A "depraved mind" must be indifferent to the life of others. *Seidler v. State* (1974), 64 Wis. 2d 456, 219 N. W. 2d 320. The statute does not require the existence of a particular state of mind in the actor at the time of the crime but only requires that there be conduct imminently dangerous to human life, which conduct evinces a depraved mind. *See: Ameen v. State* (1971), 51 Wis. 2d 175, 186 N. W.

2d 206. As a result, intoxication is no defense to second-degree murder. *Ameen, supra.*

The defendant must show that under one reasonable view of the evidence the jury could have concluded either that the defendant's conduct was not imminently dangerous to human life or that such conduct did not evince a depraved mind.

It should be pointed out that in considering the proposed instruction on homicide by intoxicated user of a firearm the trial judge indicated that he was aware of the proper test to be applied where more than one greater charge has been submitted. The trial judge stated:

"The trial judge, of course, is not required to submit a lesser-included offense to the jury unless there's some reasonable basis in the evidence for conviction of a lesser-included offense and for acquittal of the greater offense or the offenses."

The trial court concluded that there was no evidence in the case to support a conviction on the lesser offense of homicide by intoxicated user of a firearm under sec. 940.09, Stats. That section provides:

"**Homicide by intoxicated user of vehicle or firearm.** Whoever by the negligent operation or handling of a vehicle, firearm or airgun and while under the influence of an intoxicant causes the death of another may be fined not more than $2,500 or imprisoned not more than 5 years or both. No person shall be convicted under this section except upon proof of causal negligence in addition to such operation or handling while under the influence of an intoxicant."

Where a firearm is involved, the defendant must show a reasonable ground in the evidence to support a finding by the jury: (1) That the defendant handled the weapon involved; (2) that he did so negligently; (3) that he

was under the influence of an intoxicant at the time of the shooting; (4) that the shooting caused the death of another; and (5) that the defendant's negligence was the cause of the shooting and death.

There is no dispute in the evidence that Miss Teadt died as the result of the shooting and that the defendant had the firearm involved at the time. There also appears to be evidence which would support a finding that he was "under the influence of an intoxicant" at the time of the shooting.

The defendant testified to having consumed a total of 14 nine-ounce glasses of beer, seven one-ounce shots of peppermint schnapps, and two four-ounce glasses of wine in the time period of 9:30 p.m. to 1:30 a.m., just prior to the shooting. However, several witnesses who observed him shortly before or shortly after the shooting testified that the defendant did not appear to be visibly intoxicated.

Nevertheless, the defendant's expert testified that, based upon the amount stated and the time period over which it was consumed, the concentration of alcohol in the defendant's system at the time of the shooting would have been .308 percent by weight. The expert stated that such a concentration would have seriously affected the defendant's judgment, memory and coordination.

Sec. 939.22 (42), Stats., provides:

"'Under the influence of an intoxicant' means that the actor's ability to operate a vehicle or handle a firearm is materially impaired because of his consumption of an alcoholic beverage or controlled substance under ch. 161."

If the jury believed the defendant's testimony, as it was entitled to do, it could have concluded that the defendant was under the influence of an intoxicant at the time of the shooting. This conclusion is substantiated by the

trial court's decision to instruct the jury on intoxication as a defense to the first-degree murder charge.

The trial court concluded that submission of the homicide by intoxicated user of a firearm charge was not warranted however, because there was no ground in the evidence to support a finding that defendant handled the weapon involved in the shooting in a negligent manner. On appeal the defendant relies on his own testimony and the testimony of Frank Dolish of the Wisconsin department of justice, crime laboratory bureau, to furnish the ground for such a finding.

Dolish testified as to the results of an atomic absorption test, a test to determine whether an individual has fired a handgun. He stated that for the result to be "positive" (meaning that a handgun had been fired), a minimum quantity of two elements, barium and antimony, must be found in a proper distribution in the salts swabbed from the backs and palms of the individual's hands. Quantities must be greater on the backs of the hands than on the palms.

In testing the swabs taken from the defendant shortly after the shooting, Dolish found neither the proper amounts nor distribution of the elements required for a "positive" finding. As a result, Dolish was unable to state for certain that the defendant had or had not fired a handgun. He stated that there could have been a number of reasons which might account for the fact that the elements were not present in the requisite quantities: The salts containing them could have been dislodged from the hands by washing, sweating, rubbing on clothing or against other objects, or the swabs could have been incorrectly taken.

The defendant contends that these findings could support a conclusion that the weapon was discharged in an abnormal manner, indicating negligent handling. At trial he was unable to recall precisely how or why the gun discharged—he indicated that it may have fallen

and struck the floor with such force as to cause the weapon to fire. He argues that this evidence, combined with the statement of Edward Edge who gained the impression in talking with the defendant shortly afterwards that the shooting could have been accidental, while circumstantial, is sufficient to support an inference that he was negligent in handling the gun at the time of the shooting.

The state argues that this inference is rebutted by the undisputed testimony of Ronald Diedericks, a weapons expert. Diedericks testified that the weapon was equipped with a functional safety mechanism. The weapon could discharge if dropped only if the hammer was placed in a cocked position beforehand and then only if the gun landed on the hammer when it fell.

We do not believe the evidence is sufficient to reasonably show the act of shooting was a mere misadventure while the defendant was intoxicated as contemplated by sec. 940.09, Stats. He made no explanation as to why he brought the gun with him when he returned to Diana's home for a second time after the quarrel. From our review of all the evidence as it appears in the record, we are of the opinion that there was no reasonable basis for acquittal of both first- and second-degree murder charges and conviction of homicide by intoxicated user of a firearm. It was not error to refuse the request for an instruction of this lesser charge.

During the course of the trial the state requested the bloodstained nightgown which the deceased was wearing on the night of the shooting be admitted in evidence. The defense objected on the ground that the nightgown had no probative value and would have a tendency to inflame the jury or to prejudice the defendant. The state argued relevance in that the garment would tend to negate any proposed defense that the shooting may have occurred in the heat of passion, during a struggle, or in self-defense, since there were no holes or tears in

the garment. Although characterizing the garment as "gruesome," the trial court ruled the nightgown admissible.

The defendant argues on appeal that admission of the garment into evidence was error in that the state should not have been allowed to rebut a position which the defense had not yet taken. The defendant further argues that photographs of the deceased and testimony of witnesses who had observed the scene, which evidence had already been admitted without objection, adequately demonstrated lack of struggle. As such, the nightgown was of cumulative effect only and, it is argued, because of its tendency to inflame the jury, should have been excluded.

In *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557, this court adopted Rule 303 of the American Law Institute Model Code of Evidence. Subsequently codified in sec. 904.03 of the Wisconsin Rules of Evidence, that rule provides that it is within the trial judge's discretion to exclude evidence where he finds that its probative value is outweighed by the possibility that it will create a substantial danger of undue prejudice.

It appears clear that the nightgown had some probative value. As the state argued at trial, the photographs were inadequate to show the underside of the garment.

The exhibits, including the photographs of the body and the nightgown, are before us as a part of the record. An inspection of these exhibits leaves us with the positive impression that the bloodstained nightgown would not shock the sensibilities of the jury to the extent it would inflame the jury to the prejudice of the defendant. It is our belief the photographs, which were not objected to, present a much more "gruesome" picture than the nightgown. The trial court did not abuse its discretion in admitting the nightgown in evidence as an exhibit.

Defendant also argues that the court erred in sending the nightgown to the jury room as an exhibit. As the state points out, defendant did not object to sending the nightgown to the jury nor did he allege error in doing so on motions after verdict. Where not so raised, such errors are not ordinarily entitled to review by this court. *Baldwin v. State* (1973), 59 Wis. 2d 116, 207 N. W. 2d 630.

In attempting to establish that he lacked the intent to kill required for conviction of first-degree murder, defendant sought to introduce evidence of the length of time that he and decedent had been sexually intimate. The trial court permitted defendant to testify to sexual intimacy on the weekend preceding the shooting. However, it ruled that testimony as to the number of times defendant had been intimate with deceased during the preceding two months was too remote in time from the shooting to be relevant on the question of intent.

In *State v. Carter* (1969), 44 Wis. 2d 151, 170 N. W. 2d 681, this court upheld a similar ruling where defendant sought to introduce evidence of his wife's previous misconduct with other men. There the court reiterated that a man's intent is generally to be determined by considering his acts and the surrounding circumstances. While the relationship and attachment between the parties may have a bearing on whether or not defendant intended to kill decedent, that relationship was adequately established by other evidence. In addition to the act of intimacy on the prior weekend, defendant was permitted to testify as to plans for marriage and to the fact that decedent presumed she was pregnant with his child. It was not error to exclude the additional testimony.

The defendant asks for a new trial in the interest of justice.

In the course of cross-examination, the prosecutor asked the defendant if he had ever been convicted of a crime and the defendant answered that he had not.

The prosecutor then, in the presence of the jury, asked the defendant about a conviction for disorderly conduct of a George M. Jones which had occurred in November of 1968. The following exchange occurred:

"*The Witness:* May I say something Mr. Ewers. You forget my name and my dad's name are the same. That was my dad, not me.

"*Mr. Ewers:* This was your father?

"*The Witness:* Yes, it was.

"*Mr. Ewers:* If that's your father, I apologize. I requested a certificate of conviction. Your father's Matthew.

"*The Witness:* Mine is Michael. It gets mixed up sometimes."

A short time later the prosecuting attorney asked the court, again in the presence of the jury, to instruct the jury to disregard any inference arising from the mentioned conviction since he could not be certain of the identity. The court so instructed the jury, stating there was "no way of knowing this George M. Jones was the same George M. Jones."

The defendant contends that the prosecutor and trial judge could have, in fact, been certain that the conviction in question was of the defendant's father and not the defendant. He contends, further, that the exchange was part of a prosecutorial ploy to impress the jury as to the defendant's unbelievability or prior violent tendencies in his family. The remedial instruction, the defendant contends, could not remove this impression from the mind of the average juror.

This court has held that a new trial in the interest of justice will be granted only if there has been an apparent miscarriage of justice and it appears that a retrial under optimum circumstances will produce a different result. *Okrasinski v. State* (1971), 51 Wis. 2d 210, 186 N. W. 2d 314; *Freeman v. State* (1971), 51 Wis. 2d 537, 187 N. W. 2d 191; *Zdiarstek v. State* (1972), 53 Wis. 2d 420, 192 N. W. 2d 833; *State v. Elson* (1973), 60 Wis. 2d 54, 208 N. W. 2d 363.

While the prosecutor could probably have made a prior effort to determine the actual identity of the person convicted of the crime in question, it does not appear that, on a new trial which was devoid of this incident, a jury would reach a different result. Other evidence was sufficient to support a conviction on first-degree murder and the remedial instruction is presumed sufficient to erase any adverse inference which the exchange may have raised. *See: State v. Dombrowski* (1969), 44 Wis. 2d 486, 171 N. W. 2d 349.

After the jury had deliberated for two hours, it sent a request to the court which read: "We would like the testimony of Captain Dilley of what Mike Jones said to him at 5:20 a.m." The court complied with the request, having that portion of Captain Dilley's testimony read which was elicited on direct examination by the state. The defendant did not object to the trial court's decision to so limit the re-reading of the testimony of the witness.

The defendant now contends that the failure of the trial court to read to the jury Captain Dilley's response to questions on cross-examination which attacked his ability to correctly recall defendant's demeanor at the time unfairly prejudiced defendant. In short, the defendant contends that the trial court abused its discretion in failing to read to the jury the portion of the record which questioned Captain Dilley's credibility.

It is well settled that the jury in a criminal case has the right to have testimony read to it by the reporter and that the extent of the testimony to be read is within the discretion of the trial court. *See: Willard v. State* (1928), 195 Wis. 170, 217 N. W. 651; *State v. Cooper* (1958), 4 Wis. 2d 251, 89 N. W. 2d 816. The defendant argues that Captain Gerald Dilley's recollection of the defendant's demeanor on the morning of the shooting varied in the context of his testimony at the preliminary hearing, at the *Goodchild-Miranda* hearing, and at the trial.

However, his testimony as to what the defendant said to him at that time did not change. His alleged inability to consistently recall the defendant's demeanor did not affect his recollection as to the statements made.

The judge limited the re-reading to that part of the testimony specifically requested. It does not appear that if the jury had the benefit of the impeachment testimony it would have decided the case differently and, accordingly, a new trial in the interest of justice cannot be ordered upon this ground.

The defendant's final contention is that the evidence, as a matter of law, is insufficient to support a verdict of guilty on a charge of first-degree murder. Basically, he argues that the evidence does not support, beyond a reasonable doubt, the conclusion that the defendant intended to kill Miss Teadt. Adequacy of proof on the issue of intent is brought into question by two factors: (1) Evidence of defendant's intoxication, and (2) defendant's argument that testimony as to certain inculpatory statements is either explained or incredible.

The defendant argues that he was intoxicated at the time of the shooting and that such intoxication negated the intent necessary to conviction on a charge of first-degree murder. The only evidence of how much the defendant had to drink prior to the shooting comes from his own testimony. He testified that he consumed a total of 14 nine-ounce glasses of beer, seven one-ounce shots of peppermint schnapps, and two four-ounce glasses of wine. The defendant's expert, Dr. Frank Kazelka, stated that, based on the amounts given by the defendant and the time period over which it was consumed, the concentration of alcohol in defendant's system at the time of the shooting would have been .308 percent by weight. He also testified that such a concentration would have seriously affected the defendant's judgment, memory and coordination, causing him to stagger and slur his speech.

None of the persons who observed the defendant shortly before or after the shooting testified that the defendant appeared intoxicated. Michael Hulbert, a bartender at Alias Smith and Jones, stated that when he talked to the defendant at the tavern between midnight and 1 a.m., he noticed no slurred speech and did not see him stagger. Peggy Peterson, a friend of the deceased who was sitting with the couple earlier in the evening, stated that none in the group was drinking much at all and that they were making a game of it.

Linda Edge, wife of Edward Edge, stated that when the defendant came to her house shortly after the shooting she could tell he had been drinking, but did not see him stagger nor hear any slurred speech. Edward Edge testified that when the defendant came to his house after the shooting he could smell intoxicants on his breath but could not state positively whether he was intoxicated.

Tom Sulser, owner of Alias Smith and Jones, stated that when he saw the defendant after 1 a.m., on the morning of the shooting, he had one or maybe two drinks and that his speech was clear. Officer Perry Edge of the Beloit police department, and brother of Edward, stated that after the defendant turned himself in and was sitting in the squad car he did not appear to be intoxicated. Captain Gerald Dilley of the Rock county sheriff's department, who interrogated him at approximately 5:20 a.m., also stated that he did not smell intoxicants on his breath, noticed no slurred speech and did not feel that he was intoxicated.

Based upon this testimony, the jury could conclude beyond reasonable doubt that the defendant was not intoxicated to the degree he would be unable to form an intent to take the life of another.

There was testimony of several inculpatory statements made by the defendant which indicate the necessary

intent. Edward Edge testified to a phone call from defendant at 1:20 a.m., just prior to the shooting, in which the defendant stated he was afraid he might do something he was going to be sorry for. Later, when defendant came to Edge's house following the shooting, the defendant stated that he had shot his girl friend and that he knew she was dead. Edge also testified that, at one point, defendant stated that maybe he "should go back and pump a couple more into her."

Officer Perry Edge testified that when defendant turned himself in he "made a comment about how he had grasped his girl friend around the neck and shot her through the back of the neck but I don't recall the exact conversation." Captain Gerald Dilley testified that, in response to a question concerning the circumstances of Miss Teadt's death, defendant stated: "There's nothing to talk about. I went there to kill her and I killed her. That's all there is to it." Defendant later stated: "I have killed men before and I don't kill somebody unless I want to kill them."

The defendant contends that the statement made to Edward Edge on the phone was made because of his fear that he would return to Diana's house, resume the argument, and that she might call the police. He testified he could not recall telling Edge later that he had shot Diana through the back of the neck. He also denied making the statement to Officer Perry Edge, and contends on appeal that Edge's credibility was impeached because he failed to include the statement in his incident report and had not specifically recalled it in answer to questions at the prior *Goodchild-Miranda* hearing. He argues that Captain Dilley's credibility was impeached because of alleged inconsistencies in his recollection of defendant's demeanor at the time of interrogation.

It is obvious that if the jury believed defendant's version it would not have returned a verdict of guilty

on a charge of first-degree murder. It had been instructed on the intoxication defense, but obviously concluded that the defendant was not intoxicated to the required degree to negate the intent required for first-degree murder. In spite of defendant's arguments to the contrary, the jury found the testimony of the witnesses (especially that of Captain Dilley) credible.

It is undisputed the defendant was jealous and angry; that he and the deceased quarreled; that he became angry enough to punch three holes through the bedroom door; and that he returned to the home of the deceased armed with a loaded .38-caliber revolver which killed the deceased.

While there was evidence which, if believed by the jury, would have supported an acquittal, there is also substantial evidence supporting the verdict beyond a reasonable doubt. *See: State v. Chacon* (1971), 50 Wis. 2d 73, 183 N. W. 2d 84. The question was basically one of credibility. Credibility of witnesses is a determination for the jury. *Tobar v. State* (1966), 32 Wis. 2d 398, 145 N. W. 2d 782, certiorari denied (1968), 390 U. S. 960, 88 Sup. Ct. 1059, 19 L. Ed. 2d 1157; *State v. Hunt* (1972), 53 Wis. 2d 734, 193 N. W. 2d 858; *Lemerond v. State* (1969), 44 Wis. 2d 158, 170 N. W. 2d 700; *State v. Stevens* (1965), 26 Wis. 2d 451, 132 N. W. 2d 502.

We have reviewed the record in this case carefully and find no reversible error. The evidence the jury could deem credible is amply sufficient to sustain the verdict of first-degree murder. Nor is there any good reason to believe a new trial would bring a different result.

*By the Court.*—Judgment and orders affirmed.