STATE, Plaintiff-Respondent, v. KLIMAS, Defendant-Appellant.†

Court of Appeals

*No. 78–553–CR. Argued March 15, 1979.—*
*Decided December 20, 1979.*
(Also reported in 288 N.W.2d 157.)

† Petition to review denied.

For the defendant-appellant there were briefs by *Richard L. Cates,* state public defender, and *Charles*

*Bennett Vetzner,* assistant state public defender, and oral argument by University of Wisconsin law student, *Donna Tamanaha.*

For the plaintiff-respondent there was a brief by *Bronson C. La Follette,* attorney general, and *David J. Becker,* assistant attorney general, and oral argument by *David J. Becker,* assistant attorney general.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

BABLITCH, J.    This is an appeal from an order of the circuit court for Rock County, entered on August 17, 1978, denying a motion for postconviction relief under sec. 974.06, Stats.

Alvin Klimas (defendant) was convicted of second-degree murder after a jury trial on June 8, 1974, for killing his wife, Janice Klimas.  He was sentenced to an indeterminate term of not less than five nor more than twenty years of imprisonment.  On a direct appeal preceding the present appeal, the defendant challenged only the terms of his sentence.  The sentence was affirmed by the Wisconsin Supreme Court in *Klimas v. State,* 75 Wis.2d 244, 249 N.W.2d 285 (1977).

The present motion and appeal challenge the constitutionality of defendant's conviction.  Defendant asserts that the trial court's refusal to allow psychiatric testimony concerning his mental state at the time of the murder, and its refusal to submit a manslaughter instruction to the jury, deprived him of due process of law.

The evidence adduced at trial establishes that defendant and his wife were married in 1960 and had a troubled relationship during most of their marriage.  Mrs. Klimas was involved in repeated extra-marital affairs beginning shortly after the couple was married.  She left the defendant and the couple's two daughters in 1965, and commenced a divorce action.  The defendant successfully defended the action and the two subsequently reconciled. In October, 1973 Mrs. Klimas moved into an apartment,

taking the children with her. She again commenced divorce proceedings. Pursuant to a temporary order in that action in January, 1974, Mrs. Klimas was required to return with the children to the family home in Rockford, Illinois, and the defendant moved to Clinton, Wisconsin where some of his family resided.

Various witnesses testified at trial as to the defendant's physical and emotional reaction to the breakdown of the marriage. Defendant was employed as an insurance agent, and several of his clients and friends testified that he lost a great deal of weight during the separation and appeared visibly distraught on many occasions. The defendant testified that he was particularly upset at his wife's association with a man named Don Johnson. He said that he had witnessed his wife and Johnson together on several occasions, and that he had overheard and tape recorded many telephone conversations between the two. He said that he had heard Johnson tell his wife to get everything she could out of the divorce. Defendant was concerned that Johnson would receive a half interest in the home he and his wife had purchased just prior to the commencement of the divorce proceedings if Johnson and Janice Klimas got married. He was also concerned, he said, about the welfare of his daughters.

During the separation the defendant went out with his wife on dates and had sexual intercourse with her on some occasions. He also threatened her concerning her relationship with Johnson. On one occasion in November, 1973 he pointed an unloaded rifle at her and pulled the trigger. Defendant testified that this incident upset him because he realized that he could have killed her. Various witnesses testified that Janice Klimas told them of an incident in December when the defendant had tried or threatened to strangle her. Defendant denied this, but admitting having tried to frighten his wife on this

occasion and asking her if she were "ready to die." Other witnesses testified that about two weeks prior to the killing Janice Klimas had shown them a note which she said she had received from the defendant, along with a bullet, warning her to straighten up and take care of his girls or he would take matters into his own hands.

In early January, the defendant placed an extension and recording device on his wife's phone to intercept her conversations with Johnson. He also followed her on many occasions. He testified that he used the recordings and certain photographs and letters to blackmail his wife into agreeing to place their home in trust for the benefit of their daughters.

On February 4, 1974 the defendant, his wife, and their daughter Lenore met at an attorney's office to discuss the trust agreement. Lenore objected to the agreement, pursuant to which the home would eventually be sold, because she wanted to continue living there. The agreement was not signed, which greatly upset the appellant. He said that although he was not normally a drinking man, he went home from the attorney's office and drank whiskey. Later that evening he visited some friends who testified that he looked sick and was close to tears.

On the morning of the following day, appellant drank whiskey and listened to the tape recordings of his wife's conversations with Johnson. He had arranged on the previous day to take his wife and children out to dinner that night. He said that he drank heavily during the day, but did not feel intoxicated when he went to pick up his family. They had dinner at a restaurant in Rockford. The defendant testified that the atmosphere was tense because of the conflict between him and his daughter over the trust agreement.

After dinner, the appellant took his family for a drive in the country. His wife sat next to him in the front seat of the car and his daughters sat in the rear seat.

The defendant testified that he wanted to create an opportunity to be alone with his wife so that he could "scare the daylights out of her" and convince her that he was "desperate." He began to drive towards Clinton. In the car was a bottle of whiskey which he had placed there earlier in the day. In a Kleenex box on the floor of the car near the driver's seat were a .32 and a .22 caliber revolver. He said he had obtained the guns some weeks previously after an incident during which Johnson and another had followed him. He testified that he bought them for protection, since as an insurance salesman he frequently carried large sums of money in "rough" neighborhoods, and that he had placed them in the car several days beforehand. He also testified that his wife was terrified of guns and that she knew he didn't ordinarily drink much.

During the drive, the defendant and his wife began arguing about her relationship with Johnson. The radio was on and the children did not hear the conversation. At some point in the conversation defendant requested his wife to give him some whiskey, and she held the bottle while he drank some of it. Later, the defendant pulled the .22 caliber revolver from the Kleenex box, placed it on his lap where the children could not see it, and cocked it. He testified that he was "pretty enraged" at this time. He told his wife to roll down the window on her side of the car, aimed the gun out the window and pulled the trigger three times. The gun misfired each time. The defendant then brought out the .32 caliber revolver and pulled the hammer back. He testified that he told his wife something like "I could kill you."

Defendant drove to his mother's house in Clinton, intending to drop the children off so he could take his wife to an isolated place and frighten her. Lenore got out of the car and began to walk toward the house. The younger daughter, Dawn, could not get her seatbelt un-

fastened and remained in the back seat. Mrs. Klimas opened her door and apparently made a move to leave the car, simultaneously pushing defendant's hand and calling to Lenore to get the police. The defendant said that he grabbed for his wife and then pulled the trigger three times. Mrs. Klimas fell from the car, and the defendant sped away. Mrs. Klimas died at the scene from two bullet wounds in her back. The defendant testified that, though he must have meant to pull the trigger, he did not intend to kill his wife and did not "see her" during the shooting.

After leaving the scene of the shooting, the defendant drove to a friend's home 18 miles away and told him he thought he had shot his wife. The defendant then called his attorney and asked him to find out if his wife had been hurt and what had happened to Lenore.

Dawn, who was eleven at the time of trial, testified that during the drive to the friend's house she asked her father why he had shot her mother and he responded that her mother was sinful and that he "just couldn't stand it anymore." The defendant testified that he remembered nothing of this conversation.

The defendant was arrested at his friend's house several hours after the shooting. When told of his wife's death, he cried. He was charged with first-degree murder.

At trial the defendant's sole line of defense was that he was guilty of a crime less than first-degree murder. He entered pleas of not guilty and not guilty by reason of mental disease or defect. Pursuant to sec. 971.175, Stats., a bifurcated trial is required when such pleas are coupled to determine separately the issue of defendant's guilt of the alleged act and the issue of his mental responsibility at the time of the crime. At the outset of the trial the defendant requested a single trial on both issues. After the trial court denied this motion he with-

drew his plea of not guilty by reason of mental disease or defect and attempted to introduce psychiatric testimony pertaining to hs mental condition at the time of the killing.

The trial court excused the jury and heard a detailed offer of proof in the form of testimony by a court-appointed psychiatrist who had examined the defendant. The court ruled that the testimony was inadmissible on the issue of defendant's intent to commit the crime, relying on *Curl v. State,* 40 Wis.2d 474, 162 N.W.2d 77 (1968), *State v. Hebard,* 50 Wis.2d 408, 184 N.W.2d 156 (1971), and *State v. Anderson,* 51 Wis.2d 557, 187 N.W.2d 335 (1971).

At the close of the evidence the trial court refused to submit requested instructions on manslaughter or homicide by reckless conduct, and instructed the jury on the elements of first and second-degree murder. The jury found the defendant guilty of second-degree murder after twice returning for reinstruction on the offenses submitted for their consideration.

Subsequent to the defendant's direct appeal to the Wisconsin Supreme Court, the cases relied on by the trial court in excluding the proffered psychiatric testimony were overruled in *Schimmel v. State,* 84 Wis.2d 287, 267 N.W.2d 271 (1978). The supreme court's opinion followed *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir. 1978), a habeas corpus action which challenged a Wisconsin defendant's conviction for first degree murder. The federal court held that the exclusion of psychiatric testimony concerning the defendant's mental capacity to form the specific intent to kill, coupled with a jury instruction that the defendant was presumed to have intended the natural and probable consequences of his acts, had the effect of establishing a conclusive presumption on the element of intent, thereby unconstitutionally relieving the state of its burden of proving that element beyond a

reasonable doubt under the holdings of *In Re Winship,* 397 U.S. 358 (1970), *Mullaney v. Wilbur,* 421 U.S. 684 (1975), and *Morissette v. United States,* 342 U.S. 246 (1952). The court also held that the exclusion of the testimony, which it found to be relevant and competent, deprived the defendant of his sixth and fourteenth amendment rights to present a defense under *Chambers v. Mississippi,* 410 U.S. 284 (1973).

Under the holdings of *Hughes, supra,* and *Schimmel, supra,* the psychiatric evidence in this case should have been admitted. The psychiatrist's testimony that the defendant's ability to form an intent was impaired by his extreme state of depression was clearly relevant to disprove the specific intent element of first-degree murder. The trial court correctly so found in its decision denying defendant's motion for post-conviction relief. It held, however, that the error in excluding the testimony was harmless since the defendant was convicted of second-degree murder, a crime which requires no specific intent. *See, Wagner v. State,* 76 Wis.2d 30, 48, 250 N.W.2d 331 (1977). It also held that the evidence as a whole, with or without the excluded testimony of the psychiatrist, was insufficient to support a verdict of manslaughter.

On this appeal the defendant has constructed an intricate series of arguments which seek to extend the rationale of *Hughes, supra,* and *Schimmel, supra,* to lesser degrees of homicide than first-degree murder. He contends generally that psychiatric testimony concerning a homicide defendant's state of mind is crucial to distinguish between greater and lesser offenses. Specifically, he raises the following issues:

1. Whether the exclusion of psychiatric testimony, coupled with the standard instruction on second-degree murder, unconstitutionally relieved the state of its burden of proving all elements of second-degree murder beyond a reasonable doubt.

2. Whether the exclusion of the testimony deprived him of his right to present the defense that he acted in the heat of passion upon adequate provocation and was therefore guilty of the lesser offense of manslaughter.

3. Whether the trial court's refusal to give a jury instruction on manslaughter deprived him of due process of law.

At the outset, the state contends that the defendant has waived the right to raise the first two issues by way of a motion for postconviction relief under sec. 974.06, Stats., since he failed to raise them on his direct appeal.[1] The state urges us to apply the federal doctrine of "deliberate bypass" under federal cases construing 28 U.S.C. sec. 2255,[2] after which sec. 974.06 was patterned. We decline to do so.

Although sec. 974.06 has been called "almost a carbon copy" of the federal habeas corpus statute, *State v. Theoharopoulos,* 72 Wis.2d 327, 331, 240 N.W.2d 635, 637 (1976), the federal statute contains no counterpart to subsection (4) of sec. 974.06. That subsection provides in part:

Any ground [for relief under this section] . . . *knowingly, voluntarily and intelligently waived* in the proceeding that resulted in the conviction or sentence or in any other proceeding the prisoner has taken to secure relief may not be the basis for a subsequent motion, unless the court finds a ground for relief asserted which *for suffi-*

---

[1] The state's additional assertion that the defendant waived his right to raise these issues because the testimony was not offered for the specific purpose of establishing heat of passion manslaughter is not supported by the record. While it is apparent that trial counsel's primary objective was to elicit testimony negating the specific intent element of first-degree murder, he expressly prefaced the offer of proof with a statement that his purpose was to show that the defendant's conduct fit within the definition of lesser degrees of homicide, including manslaughter.

[2] *See Kaufman v. United States,* 394 U.S. 217 (1969); *Coco v. United States,* 569 F.2d 367 (5th Cir. 1978); *Howard v. Daggett,* 526 F.2d 1388 (9th Cir. 1975).

*cient reason* was not asserted . . . . (Emphasis supplied.)

In his brief on direct appeal to the state supreme court, the defendant stated that he was not attacking the exclusion of the psychiatric testimony on that appeal because the supreme court had determined the issue adversely to him in *Hughes v. State*, 68 Wis.2d 159, 227 N.W.2d 911 (1975) only a few months earlier. The supreme court's holding in *Hughes, supra*, remained the settled law in this state until after this defendant's direct appeal had been decided. The subsequent holdings of the federal court in *Hughes, supra*, and of the supreme court in *Schimmel, supra*, were not reasonably foreseeable at the time of appeal.

Under these circumstances, we hold that the defendant's failure to raise the issues on direct appeal was not a "knowing, voluntary and intelligent waiver" within the meaning of the statute, and that he had a "sufficient reason" for failing to assert them at that time.[3] Moreover, the issues presented on this appeal are issues of significant constitutional magnitude. The Wisconsin Supreme Court has held that such issues must be considered in postconviction relief proceedings "[e]ven though the issue might properly have been raised on appeal." *Bergenthal v. State*, 72 Wis.2d 740, 748, 242 N.W.2d 199, 203 (1976). We consequently turn to the merits of the defendant's contentions with respect to the psychiatric evidence.

## CONCLUSIVE PRESUMPTION-BURDEN OF PROOF

In *Hughes, supra*, the federal court did not hold that Wisconsin's rebuttable presumption that a person intends

---

[3] *See Sunal v. Large*, 157 F.2d 165 (4th Cir. 1947).

the natural and probable consequences of his acts was constitutionally invalid standing alone. The court noted that under this state's law the specific intent element of first-degree murder "is the sole factor which distinguishes that crime from second degree murder," 576 F.2d at 1254, and held:

[B]y instructing the jury to presume intent if not rebutted, *and* by excluding psychiatric evidence offered to rebut the presumption, Wisconsin set up a conclusive presumption which unconstitutionally relieved the prosecution of the burden of proving the element of specific intent beyond a reasonable doubt. 576 F.2d at 1255. (Emphasis supplied.)

Second-degree murder is defined in sec. 940.02, Stats., as causing a death by "conduct imminently dangerous to another and evincing a depraved mind, regardless of human life." Manslaughter is defined in sec. 940.05 (1), Stats., as an act performed "[w]ithout intent to kill and while in the heat of passion." The supreme court has held that the "essential difference" between these two crimes lies " 'in the state of mind with which the conduct is carried out.' " Citing *State v. Hoyt, reh.* 21 Wis.2d 284, 128 N.W.2d 645 (1964), 21 Wis.2d 310, 124 N.W.2d 47 (1963). *Kasieta v. State,* 62 Wis.2d 564, 572, 215 N.W.2d 412, 416 (1974).

The trial court gave the standard jury instruction on second-degree murder, Wis J I—Criminal 1110, which contains the following sentence:

The depravity of mind referred to in second degree murder *exists* when the conduct causing death demonstrates an utter lack of concern for the life and safety of another *and for which conduct there is no justification or excuse.* (Emphasis supplied.)

Applying the reasoning of the *Hughes* decision, the defendant argues that this language creates an implied

presumption that one who commits homicide has a depraved mind unless justification or excuse is shown. He reasons that the exclusion of psychiatric testimony establishing the justification or excuse of heat of passion manslaughter, coupled with the instruction, turns the rebuttable presumption into a conclusive presumption which relieves the state from proving "the element of depravity" beyond a reasonable doubt.

The defendant's argument overlooks the fact that actual depravity of the mind of an accused is not an element of the crime of second-degree murder. The supreme court has held that the crime requires no particular state of mind. *Wagner v. State,* 76 Wis.2d 30, 48, 250 N.W.2d 331 (1977); *Jones (George Michael) v. State,* 70 Wis.2d 41, 49, 233 N.W.2d 430 (1975); *Ameen v. State,* 51 Wis. 2d 175, 184–85, 186 N.W.2d 206 (1971).

In *Wagner, supra,* the court called "overly broad" language in two prior cases implying that "intent to harm" was an element of second-degree murder and stated:

Intent to kill is not an element of second-degree murder. Nor is intent to do harm an element of second-degree murder. *The statute does not require the existence of any particular state of mind* in the actor at the time of the crime but only requires that there be conduct imminently dangerous to human life, which conduct *evinces* a depraved mind. [Citations omitted; emphasis supplied.] 76 Wis.2d at 48, 250 N.W.2d at 341.

We are compelled by this language to conclude that the state of mind which distinguishes manslaughter from second-degree murder under *Kasieta, supra,* must necessarily be the "heat of passion" required by the manslaughter statute, and not the depravity of mind "evinced" by conduct constituting second-degree murder.

Since the prosecution is not required to prove any state of mind to convict a defendant of second-degree murder,

that portion of the jury instruction defining depravity of mind does not relieve it of the burden of proving any element of the offense. In addition, psychiatric testimony establishing that a defendant acted in the heat of passion would not tend to negate any element of second-degree murder. Therefore, we hold that the rationale of *Hughes, Schimmel* and *Mullaney v. Wilbur, supra,* is inapplicable to the burden of proof issue raised by the defendant.

## RIGHT TO PRESENT A DEFENSE

The *Hughes* court also held that defendant's right to present relevant and competent evidence in his defense "is a right which has independent status under the sixth and fourteenth amendments." 576 F.2d at 1255. It held that the exclusion of psychiatric testimony concerning the defendant's capacity to form the specific intent to kill deprived the defendant of his right to present evidence. 576 F.2d at 1255–56.

The defendant contends that the psychiatric testimony offered in this case is relevant and competent on the issue of heat of passion manslaughter. Based on our review of the proffered testimony, we conclude that it does not tend to establish a "heat of passion" defense to second-degree murder, as that term is defined under longstanding Wisconsin case law. Consequently, we need not and do not address the issue whether psychiatric testimony, as a general matter, is competent and admissible to establish a manslaughter defense.

The Wisconsin Supreme Court has repeatedly held that only those "heat of passion" homicides which are provoked by adequate, reasonable cause sufficient to overcome the judgment of an ordinary person in similar circumstances are entitled to be treated as manslaughter,

rather than murder. In *Carlone v. State*, 150 Wis. 38, 41, 136 N.W. 153, 154 (1912), the court stated:

It is not sufficient proof of heat of passion for the accused to merely testify that he was exceedingly angry or passionate at the moment in question. Such testimony must be supplemented by proof of facts and circumstances showing provocation as would ordinarily produce heat of passion. [Citations omitted.]

Similarly, in *State v. Hoyt, reh.* 21 Wis.2d 284, 291, 128 N.W.2d 645, 648 (1964), 21 Wis.2d 310, 124 N.W.2d 47 (1963), the court said:

If Mrs. Hoyt's testimony be believed, it could readily be found that her acts resulted from an emotional or mental disturbance produced by her husband's provocative conduct. In terms of the standards for heat-of-passion manslaughter, the question would remain whether the provocation offered would be sufficient in character and degree to cause the same result in an ordinarily constituted person.

The supreme court has consistently held that the issue of provocation, as distinct from the issue of a defendant's particular state of mind at the time of a homicide, must be determined under an objective test. In *Hoyt*, 21 Wis. 2d at 290, 128 N.W.2d at 648, the court phrased the test as follows:

That which will constitute "the heat of passion" which will reduce what would otherwise be murder to manslaughter "is such mental disturbance, *caused by reasonable, adequate provocation, as would ordinarily* so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, *uncontrollably,* to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposi-

tion." It has been said that " 'the provocation, in order to be sufficient in law, must be such as, naturally and *instantly, to produce in the minds of persons, ordinarily constituted,* the highest degree of exasperation, rage, anger, sudden resentment, or terror.' " [Citations omitted; emphasis supplied.]

In *Hayzes v. State,* 64 Wis.2d 189, 197, 218 N.W.2d 717, 721 (1974), the court held that it was "firmly and finally committed" to the objective test set forth in *Hoyt* and expressly refused a request that it "consider the facts subjectively as they apply to the individual defendant in this case."

Several recent cases suggest that the primary issue to be considered in determining whether a homicide is manslaughter is the issue of provocation, under the objective test, rather than the issue of the individual defendant's subjective state of mind at the time of the offense. In *Ameen v. State, supra,* the court said:

The test is objective, not subjective. The inquiry is not as to whether this defendant was angry at someone or about something at the time he shot and killed the deceased. The question to be asked is whether there existed such provocation as would have caused the state of mind claimed in an ordinary person under the same circumstances. 51 Wis.2d at 183, 186 N.W.2d at 211.

Similarly, the court held in *Brook v. State,* 21 Wis.2d 32, 42–43, 123 N.W.2d 535, 540 (1963), and reiterated in *State v. Mendoza,* 80 Wis.2d 122, 158, 258 N.W.2d 260, 275 (1977):

[W]ith respect to provocation, the test applied is not the subjective one of whether it was sufficient to produce in defendant such passion as to cause him to kill without intent to do so. Rather it is the objective one of whether the provocation would have caused such state of mind in persons ordinarily constituted.

To the same effect is *Bosket v. State,* 31 Wis.2d 586, 595, 143 N.W.2d 553, 557 (1966), which upheld the trial

court's refusal to submit a manslaughter instruction despite the fact that the defendant in that case was "obviously a desperate man," stating:

[T]he question is whether the conduct of [the victim], coupled wth defendant's plight, constituted adequate provocation to cause such heat of passion in persons ordinarily constituted as to cause them to kill without intent to do so.

During the offer of proof in this case the psychiatrist's testimony was exclusively focused on the defendant's personal history and his subjective state of mind at and prior to the time of the homicide. The doctor gave an account of the defendant's family background and marital history, including past depressions and a suicide attempt related to marital problems some ten years before the killing. The doctor stated that the defendant had been suffering from severe depression for several months, which had become "psychotic in intensity" at the time he shot his wife. He said that the events on the day preceding the shooting had "really overwhelmed him," and that the defendant had made a tape recording describing both homicidal and suicidal ideas on that date and also describing "a pattern of behavior which could carry them out." He stated that the defendant was under "severe stresses" and felt his sense of manhood and family loyalties "jeopardized by his wife's infidelity and by what *he viewed* as her behavior flaunting that in front of him and in front of other persons." (Emphasis supplied.) Although he characterized the killing as "an act impulsively performed by a desperate man overwhelmed by a psychotic depressive illness," he concluded that the defendant "did not have a mental disease or defect such as would have rendered him unable to conform his conduct to the requirements of law or to appreciate the criminality of his conduct" at the time of the killing.[4]

---

[4] The doctor couched his conclusion in terms of the American Law Institute's test of a defendant's mental responsibility for

We cannot accept the defendant's suggestion that testimony concerning the defendant's individual background and subjective state of mind during an obviously stressful time in his life is relevant on the issue of provocation under the objective test. "Relevant evidence" is defined by sec. 904.01, Stats., as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The evidence offered in this case has no bearing on the mind of the ordinarily constituted person, nor on what could reasonably be expected to provoke such a person to the heat of passion. Instead, the testimony depicts the defendant as a person in a highly abnormal condition of long duration, whose view of reality was colored by an illness which finally overwhelmed him. It may be that expert evidence could be adduced which would tend to prove or disprove the existence of reasonable, adequate provocation under the objective test. We do not determine that question, however, since the testimony in this case has neither effect.

With respect to the issue of whether the defendant in fact acted "while in the heat of passion," as a subjective matter, the testimony is relevant. In our view, however,

criminal conduct which is embodied in sec. 971.15, Stats. The statute provides:

Mental responsibility of defendant. (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

(2) As used in this chapter, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence.

it tends to disprove that the defendant had the requisite state of mind to establish manslaughter. The doctor's testimony that the defendant experienced homicidal thoughts well before the shooting is inconsistent with the defendant's claim that he was "instantaneously" overwhelmed by the totality of the circumstances preceding it, and indicates a degree of premeditation. His confirmation of the defendant's testimony that he consumed large amounts of alcohol during the two days before the shooting and listened to the tapes of his wife's conversations with her lover tends to support a finding that the defendant's conduct in shooting her evinces a depraved mind, which has been described as "a self-created condition." *State v. Weso*, 60 Wis.2d 404, 409, 210 N.W.2d 442, 444 (1973), *State v. Johnson*, 233 Wis. 668, 672, 290 N.W. 159, 161 (1940). His testimony that the defendant's act was "impulsive" does not tend to show that it was "uncontrollable" or that the defendant, however desperate, was then in a state of "the highest degree of exasperation, rage, anger, sudden resentment, or terror" necessary to establish heat of passion manslaughter. *Hoyt, supra*, 21 Wis.2d at 290, 128 N.W.2d at 648.

We consequently hold that the exclusion of the proffered testimony did not deprive the defendant of his constitutional right to present a defense.

## MANSLAUGHTER INSTRUCTION

The defendant contends that the evidence which was admitted at trial is sufficient to require the trial court to submit a manslaughter instruction. He submits that the failure to do so deprived him of his right to a trial by jury on the issue of provocation and relieved the state of its burden to disprove the defense theory of provocation in violation of his fourteenth amendment rights. These issues were not raised on the defendant's direct appeal to

the supreme court. The defendant offers no reason to explain his failure to raise them at that time.

A motion under sec. 974.06, Stats., for postconviction relief may not be used as a substitute for direct appeal. *Vara v. State,* 56 Wis.2d 390, 393, 202 N.W.2d 10 (1972), *Sass v. State,* 63 Wis.2d 92, 95, 216 N.W.2d 22 (1974). Such a motion may be used only to raise issues of jurisdiction or of constitutional dimensions. *State v. Schlise,* 86 Wis.2d 26, 29, 271 N.W.2d 619 (1978), *Peterson v. State,* 54 Wis.2d 370, 381, 195 N.W.2d 837 (1972).

In *Schlise, supra,* the supreme court refused to address a claimed violation of defendant's right to due process arising out of the trial court's refusal to give a requested instruction, observing that merely labeling an alleged error as constitutional in dimension did not make it so. 86 Wis.2d at 29, 271 N.W.2d at 620. Similarly, in *State v. Langston,* 53 Wis.2d 228, 191 N.W.2d 713 (1971), the court held that an alleged deprivation of the right to trial by jury would not be reached on a sec. 974.06 motion merely because the defendant claimed constitutional error. 53 Wis.2d at 232, 191 N.W.2d at 715. *See also Carrillo v. United States,* 332 F.2d 202 (10th Cir. 1964); *United States ex rel. Rooney v. Housewright,* 568 F.2d 516 (7th Cir. 1977); *James v. Reese,* 546 F.2d 325 (9th Cir. 1976); *Bonner v. Henderson,* 517 F.2d 135 (5th Cir. 1975).

It is not clear that an issue of constitutional magnitude would never be presented by a trial court's failure to submit instructions on a lesser included offense, if the same were warranted by the evidence. *See Keeble v. United States,* 412 U.S. 205, 213 (1973). Our review of the evidence in this case, however, discloses no reason to depart from the holdings of *Schlise, supra,* and *Langston, supra.* We conclude that the trial court's action in re-

fusing to give a manslaughter instruction raises no issue of constitutional stature and hold that it is accordingly beyond the scope of the relief provided by sec. 974.06, Stats.

*By the Court.*—Order affirmed.